1  **SCOTT+SCOTT**
   **ATTORNEYS AT LAW LLP**
2  Joseph A. Pettigrew (CA 236933)
   *Of Counsel*
3  jpettigrew@scott-scott.com
   600 W. Broadway, Suite 3300
4  San Diego, CA 92101
   Telephone: 619-233-4565
5  Facsimile: 619-233-0508

6  *Counsel for Plaintiffs Asbestos Workers Philadelphia Welfare*
   *and Pension Fund and Jose F. Isais*
7
   [Additional counsel on signature page.]
8
                    **UNITED STATES DISTRICT COURT**
9              **NORTHERN DISTRICT OF CALIFORNIA**
                    **SAN FRANCISCO DIVISION**
10

11 | ASBESTOS WORKERS PHILADELPHIA | Case No. _____
   | WELFARE AND PENSION FUND and JOSE F. |
12 | ISAIS, Derivatively on Behalf of Nominal | **VERIFIED STOCKHOLDER**
   | Defendant WELLS FARGO & COMPANY, | **DERIVATIVE ACTION COMPLAINT**
13 |
   |                    Plaintiffs,
14 |
   |          v.                                    | **JURY TRIAL DEMANDED**
15 |
   | CHARLES W. SCHARF; KLEBER R.
16 | SANTOS; CARLY SANCHEZ; STEVEN D.
   | BLACK; MARK A. CHANCY; CELESTE A.
17 | CLARK; THEODORE F. CRAVER, JR.;
   | RICHARD K. DAVIS; WAYNE M. HEWETT;
18 | CECELIA "CeCe" G. MORKEN; MARIA R.
   | MORRIS; FELICIA F. NORWOOD; RICHARD
19 | B. PAYNE, JR.; JUAN A. PUJADAS;
   | RONALD L. SARGENT; and SUZANNE M.
20 | VAUTRINOT,
   |
21 |                    Defendants,
   |
22 |          – and –
   |
23 | WELLS FARGO & COMPANY,
   |
24 |                    Nominal Defendant.
25
26
27
28

1

# **TABLE OF CONTENTS**

2   I.     NATURE OF THE ACTION ...................................................................................1

3   II.    JURISDICTION AND VENUE .............................................................................7

4   III.   PARTIES ...............................................................................................................8

5          A.    Plaintiffs ....................................................................................................8

           B.    Nominal Defendant....................................................................................8
6
           C.    Director Defendants ..................................................................................9
7
           D.    Officer Defendants ..................................................................................11

8   IV.    THE INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS........................11

9          A.    Duties of All Individual Defendants .......................................................11

           B.    Additional Duties of Board Committees..................................................15
10
    V.     SUBSTANTIVE ALLEGATIONS .......................................................................18
11
           A.    Wells Fargo Has a Long History of Engaging in Wrongful Corporate
12               Conduct, Particularly over the Past Decade............................................18

13         B.    Wells Fargo Has Also Repeatedly Engaged in Serious and Flagrant
                 Discriminatory Conduct...........................................................................19
14
           C.    The Wells Fargo Scandals Have Caused Regulators to Impose an Asset
15               Cap ...........................................................................................................20

           D.    Wells Fargo Hired Charles Scharf as Its New CEO, Who Claims that He
16               Will Reform the Corporate Controls and Oversight Practices.................21

17         E.    Wells Fargo's Internal Controls Fail as Its Banks Continue to Discriminate
                 Against Black and Minority Borrowers....................................................22
18
           F.    Wells Fargo Committed to Programmatic Relief to Settle Major Regulatory
                 and Civil Discrimination Actions ...........................................................26
19
           G.    Wells Fargo Purported to Improve Its Diversity Recruitment Efforts.................27
20
           H.    Wells Fargo Reveals that It Views Diversity as Mere Box Checking by
21               Conducting "Sham" Interviews ...............................................................31

    VI.    THE BOARD PASSIVELY STOOD BY WHILE BEING PRESENTED WITH
22         DEI PROBLEMS ...................................................................................................37

23         A.    The 220 Documents Further Demonstrate Defendants' Liability........................37

    VII.   DAMAGES TO THE COMPANY .......................................................................43
24
    VIII.  INSIDER TRADING ALLEGATIONS .................................................................43
25
    IX.    DERIVATIVE ALLEGATIONS............................................................................44
26
    X.     DEMAND FUTILITY ALLEGATIONS ...............................................................45
27
    XI.    CLAIMS FOR RELIEF ........................................................................................46
28
    COUNT I .............................................................................................................................46

1

2

3

4

5

6

COUNT II .................................................................................................................47

COUNT III ...............................................................................................................47

COUNT IV ...............................................................................................................48

COUNT V .................................................................................................................49

COUNT VI ...............................................................................................................51

XII.    PRAYER FOR RELIEF ................................................................................51

XIII.    JURY DEMAND ...........................................................................................52

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs Asbestos Workers Philadelphia Welfare and Pension Fund ("Asbestos Workers") and Jose F. Isais ("Isais," together with Asbestos Workers, "Plaintiffs"), by and through their undersigned counsel, bring this action derivatively on behalf of Nominal Defendant Wells Fargo & Company ("Wells Fargo" or the "Company") against certain current and former members of Wells Fargo's Board of Directors (the "Board" or "Director Defendants") and executive officers ("Officer Defendants," together with the Board or Director Defendants, "Individual Defendants"), seeking to remedy breaches of fiduciary duties, unjust enrichment, corporate waste, and violation of the federal securities laws from at least 2017 through the present (the "Relevant Period"). Plaintiffs make these allegations upon personal knowledge as to the facts of their ownership of Wells Fargo stock and upon information and belief as to all other matters, based upon an in-depth review by their counsel of: (a) documents obtained pursuant to 8 *Del. C.* §220 ("Section 220") (the "220 Documents"); (b) public filings made by Wells Fargo and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases and other publications disseminated by the Company and other related non-parties; (d) news articles, shareholder communications, and postings on Wells Fargo's website concerning the Company's public statements; (e) the proceedings in a related federal securities class action captioned *SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, No. 3:22-cv-03811-TLT (N.D. Cal.) (the "Securities Action"); (f) the proceedings in past litigation and regulatory actions concerning discrimination; and (g) other publicly available information concerning Wells Fargo and the Defendants.

## I.    NATURE OF THE ACTION

1.    Wells Fargo, the fourth-largest bank in the United States, has unfortunately earned a reputation as a company that repeatedly engages in discrimination.  The breadth of lawsuits and regulatory actions against Wells Fargo for discrimination is stunning.  Among other things:

- In 2012, Wells Fargo reached a historic settlement agreement with the U.S. Department of Justice ("DOJ") in order to settle allegations that it had discriminated against Hispanic and African American borrowers in its mortgage lending practices.

1       •     In 2016, Wells Fargo reached a settlement with Wells Fargo's African American

2 financial advisors to settle claims that the Company "segregated" its workforce by race and didn't

3 offer African American financial advisers the same opportunities as White counterparts.

4       •     In 2019, after a U.S. Department of Labor ("DOL") probe, Wells Fargo entered into

5 a Conciliation Agreement.  This agreement was in response to allegations that the Company had

6 discriminated against 266 female job applicants and 282 African American job applicants in 2014.[1]

7       2.     In the aftermath of these corporate scandals, Wells Fargo attempted to rehabilitate

8 its corporate image.  A key part of Wells Fargo's rehabilitation campaign was to show the market

9 that the Company cares deeply about diversity, equity, and inclusion ("DEI"), in light of its history

10 of discrimination.  In particular, the Company was working to increase diversity representation at

11 the top levels of Wells Fargo's management.  In March 2020, Wells Fargo announced the Diverse

12 Search Requirement.  It stated, "[u]nder the leadership of our CEO, Charlie Scharf . . . [w]e are

13 requiring diverse candidate slates and interview teams for all roles at Wells Fargo with total

14 direction compensation of more than $100,000."  The Diverse Search Requirement was therefore

15 implemented, managed, and overseen in part by the Company's top officers who pledged to ensure

16 Wells Fargo complied with the mandate.

17       3.     Wells Fargo repeatedly told its shareholders that it was a dedicated and focused

18 organization on DEI.  After George Floyd's death in May 2020, social unrest was sweeping the

19 United States.  Wells Fargo Chief Executive Officer ("CEO") and Defendant Charles Scharf

20 ("Scharf") stated that Wells Fargo was focused on DEI and would do everything possible to foster

21 a culture that values diversity and inclusion.  Scharf, less than a month later, blamed Blacks for

22

---

[1]     Wells Fargo has been involved in numerous other corporate scandals over the past decade
showing its poor risk management, lack of internal controls, and reckless corporate culture.  The
extent of Wells Fargo's misconduct is extensive.  The Company defrauded mortgage investors and
mortgage bond investors, charged consumers too much for auto insurance, and violated several of
its internal governance obligations and risk management requirements.  Wells Fargo set up 3.5
million unapproved consumer accounts in order to increase its profits.  Wells Fargo's reputation
as well as its relationships with regulators, investors, and consumers was damaged by Wells
Fargo's persistent malfeasance.  The regulatory penalties have been severe.  Most notably, the
Federal Reserve System ("Federal Reserve") placed a cap on Wells Fargo's assets at $1.9 trillion
in the wake of the "fake accounts" scandal.  This was to ensure that the Company had adequately
addressed its numerous control and risk issues (the "Asset Cap").  Wells Fargo's Asset Cap has
had a significant impact on its growth and revenue, as well as limiting its ability to compete with
other large banks.

the Company's lack of Black senior-level employees in a Zoom meeting with Wells Fargo employees. He stated, "[W]hile it might sound like an excuse, the unfortunate reality is that there is a very limited pool of black talent to recruit from." Scharf's comments drew a lot of public criticism. Shareholders also took advantage of Scharf's comments to demand more information about the Company's DEI programs. Scharf's remarks in relation to a proposal for a diverse recruiting protocol, which would have required at least one woman and at most one person of ethnic or racial diversity to be included in the initial pool for all Wells Fargo's United States-based jobs, were cited by several institutional Wells Fargo shareholders. The shareholders presented the proposal to Wells Fargo, asking that it be included on the Company's proxy statement. It was then submitted for consideration and a vote at the Company's annual shareholder meeting. Wells Fargo strongly opposed the proposal and, after discussing with shareholders, agreed to provide more information about the Diverse Search Requirement in return for the shareholders withdrawing their proposal. The Defendants made numerous statements to investors in support of Wells Fargo's Diverse Search Requirement, responding to shareholder pressure. Scharf, for example, stated in the 2020 Annual Report, published February 23, 2021, that "[i]n the U.S., we are requiring a diverse slate of candidates . . . for most roles with total direct compensation of more than $100,000 per year."

4. Scharf highlighted the Diverse Search Requirement again on May 26, 2021, while testifying before the U.S. Senate Committee on Banking, Housing, and Urban Affairs. He stated that guidelines had been established that required a diverse pool of candidates to be hired for many senior positions (at least 50%). In Wells Fargo's report, *2020 Social Impact and Sustainable Highlights*, published April 2021, Scharf once again highlighted the Diverse Search Requirement. Defendants also stated that "[o]ur Diverse Search Requirement requires that for most U.S. roles with total direct compensation greater than $100,000, at least 50% of interview candidates must be diverse with respect to at least one diversity dimension." They boasted that 91% of all applicable requisitions had a diverse interview list as of 2020.

5. Defendant Carly Sanchez ("Sanchez") highlighted Wells Fargo's "candidate slate requirement for roles $100K or above" during a virtual interview on October 7, 2021, with the

Institute for Corporate Productivity, explaining that "50% – of the candidate slate that will be interviewed needs to be diverse in one dimension or another."  Investors found the representations of Defendants to be critical to Wells Fargo, not only because of its history of discriminatory behavior but also because the Asset Cap could not be lifted until the Company addressed its compliance and risk management problems.  Although Wells Fargo publicly praised the Diverse Search Requirement, it was actually conducting fake interviews with diverse candidates to prove that they were in compliance with the Diverse Search Requirement.  In reality, however, another candidate had been selected for the job.  These fake interviews were widespread and took place across many Wells Fargo business lines, both before and during the Relevant Period.  These facts made the statements of Defendants materially false and misleading.

6.      Cracks in Wells Fargo's DEI facade were first exposed by *The New York Times* on May 19, 2022.  The article detailed the accounts of Joe Bruno ("Bruno") and other former and current employees of Wells Fargo's Wealth Management Division regarding the Company's practice in conducting "fake interviews."  Wells Fargo attempted to discredit and neutralize these claims.  A spokesperson for Wells Fargo stated that there was no reason anyone would fake an interview.  Wells Fargo also claimed that fake interviews were an isolated act of rogue employees.  Wells Fargo claimed that it had investigated all claims made by *The New York Times* to the Company prior to the May 19th article.  However, they could not confirm them as true.

7.      The Defendants again praised the Diverse Search Requirement less than two weeks following *The New York Times*' May 19th article ("2022 DEI Report"), which stated that "[f]or most posted roles in the U.S. with total direct compensation greater than $100,000 per year, Wells Fargo requires that at least 50% of the interview candidates must represent a historically underrepresented group with respect to at least one diversity dimension."  Two days later, Defendant Kleber Santos ("Santos") reiterated the Diverse Search Requirement in *Business Insider*.  He stated categorically that "[t]he rule is working."

8.      Although Wells Fargo assured investors that the Diverse Search Requirement was working as it was supposed to, Wells Fargo suspended the Diverse Search Requirement abruptly on June 6, 2022.  This was to allow the Company's leaders to "study its use and make changes,"

gain confidence that "the guidelines live[d] up to their promise," and ensure that "hiring managers, senior leaders and recruiters fully understand how the guidelines should work."

9.    The truth was revealed by *The New York Times* on June 9, 2022.

10.    Wells Fargo's stock price plunged more than 10% in two days following these revelations.  It fell from $44.63 per share on June 8, 2022, to $40.08 on June 10, 2022.  This resulted in a staggering $17 billion loss of market capitalization.

11.    Many members of Congress have criticized Wells Fargo for the fake interview scandal.  They cited it as yet another example of corporate malfeasance by the Company.  Maxine Waters (Chairwoman of the U.S. House of Representatives Financial Services Committee) ("Chairwoman Waters") released a letter dated June 28, 2022, regarding Wells Fargo's fake interviews.  She stated that commitments to diversity, equity, and inclusion were not "stunts" for megabanks to take advantage of; diversity, equity, and inclusion include aspects of both moral obligations and legal obligations financial institutions have.  She stated it was unacceptable for Wells Fargo to mislead applicants or the public.  Chairwoman Waters lamented that the Asset Cap imposed by U.S. Treasury Secretary Janet Yellen had not compelled the bank to change its behavior, and that Wells Fargo continued to exhibit a troubling pattern and inability to correct it, despite Mr. Scharf's leadership.

12.    Members of the Banking, Housing, and Urban Affairs Committee of the U.S. Senate stated that they were concerned about recent reports that Wells Fargo conducted fake interviews with women and minority candidates for positions that had been already filled.

13.    Senators Sherrod Brown, Elizabeth Warren, and Bob Menendez stated that the fake interview practices used by the Company were "not only highly offensive and suggestive of systemic bias and discrimination at the bank, but also may represent a pattern of misleading shareholders."

14.    Scharf testified before the House Financial Services Committee in September 2022.  Chairwoman Waters asked Scharf: "[i]s it true that you interviewed an African-American employee to fill a position after you had already hired a White employee?  Is that true?"  Scharf responded by stating that he did not deny that "fake" interviews were conducted.  On August 1,

1    2022, the Defendants admitted that Wells Fargo had violated the Diverse Search Requirement

2    during the Relevant Period.  The Company stated that it would "reinstat[e] its diverse candidate

3    slate guidelines" but with substantial modifications.  *The New York Times* reported that Wells

4    Fargo had revealed in an internal memo that it was "reinstating its diverse candidate slate

5    guidelines" and that it had "[o]verwhelmingly [] heard [from employees] the need to improve the

6    candidate and manager experience."  Wells Fargo admitted that the policy needed "new features"

7    in order to prevent abuse.  This included "increased training for managers" and "an easier approval

8    process for exemptions to the diverse slate requirement."  The revised policy is more fluid and

9    vague than the previous requirement that 50% of candidates be from diverse backgrounds for

10   compensation above $100,000.  Diverse Search Requirement will now apply to jobs that are "in-

11   scope," based on unspecified job level, and not compensation.

12        15.    On October 31, 2022, Wells Fargo revealed in its Form 10-Q for the third quarter

13   of 2022 that in addition to the DOJ investigation, the SEC was also looking into the Company's

14   diversity hiring practices.  Analysts seized on this disclosure and linked the Company's failure to

15   shed the Asset Cap to the fake hiring scandal.  Deutsche Bank wrote in an analyst report on the

16   SEC's investigation into Wells Fargo that it "seems logical (to us, at least) that [these] issues need

17   to be resolved before the Fed lifts the asset cap."

18        16.    In addition to employment discrimination, Wells Fargo continues to discriminate

19   against its Black customers.  A *Bloomberg* investigation revealed that Wells Fargo rejected half of

20   Black applicants for mortgage refinancing, at a higher rate than other applicants.  The *Bloomberg*

21   investigation also revealed that Wells Fargo consistently rejected Asian and Hispanic applications

22   at higher rates than for White applications, too.

23        17.    Moreover, despite the nine-figure settlement with the DOJ, according to numerous

24   civil lawsuits, Wells Fargo continues to deny initial mortgage applications or other loans to Black

25   applicants, in effect practicing redlining.

26        18.    Plaintiffs' review of the 220 Documents reveal that the Board was faced with

27   numerous red flags and yet ignored the pervasive issues of discrimination, instead allowing

28

management – that already showed that it was flawed in its own oversight into DEI issues – to remain in charge of monitoring the issues and determining what remedies were necessary.

19.    For this reason, Wells Fargo's officers and directors have violated their fiduciary duties to the Company, and as a result, Plaintiffs bring this action to remedy these breaches.

## II.    JURISDICTION AND VENUE

20.    Jurisdiction lies pursuant to Article III, Section 2 of the U.S. Constitution at 28 U.S.C. §1331.  The claims asserted herein arise under §§14(a) and 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a) and 78cc(b), and Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated thereunder.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 as to the state law claims alleged, as they arise out of the same transactions and occurrences as the federal claims.  In connection with the wrongdoing complained of herein, Defendants used the means and instrumentalities of interstate commerce, the U.S. mail, and the facilities of the national securities markets.  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

21.    This Court has personal jurisdiction over each of the defendants named herein because each defendant is either a corporation incorporated, maintaining its principal executive offices, and operating in this District, or is an individual who maintains a place of business in this District or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Further, the Individual Defendants conducted much of the wrongdoing complained of herein in this District.

22.    Venue is proper in this jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b).  Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because: (i) Wells Fargo is headquartered in, and therefore is a resident of, the State of California; (ii) one or more of the Individual Defendants either resides or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein in violation of fiduciary duties owed to Wells Fargo and its shareholders, occurred in this District; and (iv) the

1  Individual Defendants have received substantial compensation in this District by doing business

2  here and engaging in numerous activities that had an effect in this District.

3      23.   **Divisional Assignment**: This action should be assigned to the San Francisco

4  Division of this Court under Local Rule 3-2(d), as the Company is headquartered in San Francisco

5  County, California.

6  **III.   PARTIES**

7      **A.   Plaintiffs**

8      24.   Plaintiff Asbestos Workers is a shareholder of Wells Fargo from at least January

9  2021, and has continuously held since then.  Plaintiff Asbestos Workers will continue to hold

10  Wells Fargo shares throughout the pendency of this action.  Plaintiff Asbestos Workers will fairly

11  and adequately represent the interests in enforcing the rights of the Company.

12      25.   Plaintiff Jose Isais is a shareholder of Wells Fargo from at least 1993 and has

13  continuously held since then.  Plaintiff Isais will continue to hold Wells Fargo shares throughout

14  the pendency of this action.  Plaintiff Isais will fairly and adequately represent the interests in

15  enforcing the rights of the Company.

16      **B.   Nominal Defendant**

17      26.   Nominal Defendant Wells Fargo is a Delaware corporation with its principal

18  executive offices located at 420 Montgomery Street, San Francisco, California 94104.  Wells

19  Fargo is a diversified financial services company that provides banking investment, and mortgage

20  products and services, as well as consumer and commercial finance, through banking locations

21  and offices, the internet, and other distribution channels in the United States and internationally.

22  Wells Fargo is currently the fourth-largest bank in the United States.  The Company's common

23  stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "WFC."

24      27.   Wells Fargo provides banking, investment, and mortgage products and services,

25  and consumer and commercial finance through physical banking locations, the internet, and other

26  distribution channels in the United States and abroad.  With approximately $1.9 trillion in balance

27  sheet assets, the Company is the fourth-largest bank holding company in the United States.

28

28.    Wells Fargo's management reporting has four distinct operating segments: (i) Consumer Banking and Lending; (ii) Commercial Banking; (iii) Corporate and Investment Banking; and (iv) Wealth and Investment Management ("Wealth Management").  A fifth segment, referred to as "Corporate," contains the Company's enterprise functions, non-core businesses, and its corporate treasury and staff functions.

29.    The Consumer Banking and Lending segment "offers diversified financial products and services for consumers and small businesses with annual sales generally up to $5 million." This "includes checking and savings accounts, credit and debit cards, as well as home, auto, personal, and small business lending."  The Commercial Banking segment "provides financial solutions to private, family owned and certain public companies."  The Corporate and Investment Banking segment "delivers a suite of capital markets, banking and financial products and services to corporate, commercial real estate, government and institutional clients globally."  The Wealth Management segment "provides personalized wealth management, investment and retirement products and services to clients across U.S.-based businesses[.]"

**C.    Director Defendants**

30.    Defendant Charles W. Scharf has served as the President and CEO of Wells Fargo, as well as having served as a member of Wells Fargo's Board of Directors, since October 2019.

31.    Defendant Steven D. Black ("Black") has served as an Independent Chairman of Wells Fargo's Board of Directors since April 2020.  Defendant Black also serves as Chair of the Company's Finance Committee and a member of the Human Resources Committee.

32.    Defendant Mark A. Chancy ("Chancy") has served as a member of Wells Fargo's Board of Directors since August 2020.  Defendant Chancy also serves or served as a member of the Audit, Finance, and Risk Committees.

33.    Defendant Celeste A. Clark ("Clark") has served as a member of Wells Fargo's Board of Directors since January 2018.  Defendant Clark also serves as Chair of the Corporate Responsibility Committee and as a member of the Governance and Nominating Committee.

34.    Defendant Theodore F. Craver, Jr. ("Craver"), has served as a member of Wells Fargo's Board of Directors since January 2018. Defendant Craver also serves as Chair of the Audit Committee and as a member of the Finance and Governance and Nominating Committees.

35.    Defendant Richard K. Davis ("Davis") has served as a member of Wells Fargo's Board of Directors since April 2022. Defendant Davis also serves as a member of the Risk Committee.

36.    Defendant Wayne M. Hewett ("Hewett") has served as a member of Wells Fargo's Board of Directors since January 2019. Defendant Hewett also serves as Chair of the Governance and Nominating Committee, and a member of the Corporate Responsibility, Human Resources, and Risk Committees.

37.    Defendant Cecilia "CeCe" G. Morken ("Morken") has served as a member of Wells Fargo's Board of Directors since 2022. Defendant Morken also serves as a member of the Audit and Corporate Responsibility Committee.

38.    Defendant Maria R. Morris ("Morris") has served as a member of Wells Fargo's Board of Directors since January 2018. Defendant Morris also serves as a member of the Human Resources Committee, and as Chair of the Risk Committee.

39.    Defendant Felicia F. Norwood ("Norwood") has served as a member of Wells Fargo's Board of Directors since April 2022. Defendant Norwood also serves as a member of the Risk Committee.

40.    Defendant Richard B. Payne, Jr. ("Payne"), has served as a member of Wells Fargo's Board of Directors since October 2019. Defendant Payne also serves as a member of the Risk Committee.

41.    Defendant Juan A. Pujadas ("Pujadas") has served as a member of Wells Fargo's Board of Directors since September 2017. Defendant Pujadas also serves as a member of the Finance and Risk Committees.

42.    Defendant Ronald L. Sargent ("Sargent") has served as a member of Wells Fargo's Board of Directors since February 2017. Defendant Sargent also serves as a member of the Audit and Governance and Nominating Committees, and as Chair of the Human Resources Committee.

43.    Defendant Suzanne M. Vautrinot ("Vautrinot") has served as a member of Wells Fargo's Board of Directors since February 2015.  Defendant Vautrinot also serves as a member of the Corporate Responsibility and Risk Committees.

44.    Defendants Scharf, Black, Chancy, Clark, Craver, Davis, Hewett, Morken, Morris, Norwood, Payne, Pujadas, Sargent, and Vautrinot constitute all of the current members of Wells Fargo's Board and are collectively referred to herein as the "Director Defendants."

**D.    Officer Defendants**

45.    Defendant Kleber R. Santos served as Head of Diverse Segments, Representation, and Inclusion ("DSRI") from November 2020 to July 2022, has served as Senior EVP, CEO of Consumer Lending since July 2022, reports directly to Scharf, and is a member of the Operating Committee of Wells Fargo.

46.    Defendant Carly Sanchez served as Wells Fargo's EVP, Talent Acquisition, Affirmative Action/Equal Employment Opportunity, Diversity Recruiting from 2013 to October 2022, and has served as Human Resources Senior Executive since October 2022.

47.    Defendants Scharf, Santos, and Sanchez are sometimes referred to collectively herein as "Officer Defendants."

48.    Defendants Scharf, Santos, Sanchez, Black, Chancy, Clark, Craver, Davis, Hewett, Morken, Morris, Norwood, Payne, Pujadas, Sargent, and Vautrinot are collectively referred to herein as the "Individual Defendants."

**IV.    THE INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS**

**A.    Duties of All Individual Defendants**

49.    By reason of their positions as directors and fiduciaries of Wells Fargo, and by virtue of their ability to control the business and corporate affairs of the Company, each of the Individual Defendants owed, and owes, Wells Fargo and its shareholders the fiduciary obligations of loyalty, good faith, and candor and were, and are, required to use their utmost ability to control and manage the Company in a lawful, fair, just, honest, and equitable manner.  The Director Defendants were, and are, required to act in furtherance of the best interests of Wells Fargo and its

shareholders, so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

50. Each Individual Defendant owes to Wells Fargo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

51. At all times relevant hereto, each Individual Defendant was the agent of each of the other Individual Defendants, and of the Company, and was at all times acting within the course and scope of such agency.

52. By virtue of their fiduciary duties of loyalty, good faith, and candor, each Individual Defendant was required to, among other things:

     a. Exercise good faith to ensure that Wells Fargo's affairs were conducted in an efficient, business-like manner;

     b. Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, requirements, and all contractual obligations, including acting only within the scope of its legal authority;

     c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

     d. Remain informed as to how the Company conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith.

53. The Individual Defendants who were and are members of the committees of the Board, assumed the responsibility to carry out the functions of their committees.

54. The Individual Defendants knowingly or consciously breached their fiduciary duties of loyalty and good faith. They did so by causing themselves or allowing other Individual Defendants to cause Wells Fargo to discriminate against Black and other minority or female borrowers, employees, and potential employees. This misconduct has caused Wells Fargo to be damaged both financially and reputationally. Furthermore, this discrimination is illegal, and engaging in illegal conduct is a *per se* violation of an officer or director's fiduciary duties to the Company.

55.     Furthermore, by virtue of their positions of control and authority as directors and/or officers of Wells Fargo, the Individual Defendants were able to, and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent other of the Individual Defendants from their misconduct.

56.     Wells Fargo's bylaws, articles of incorporation, corporate governance guidelines, and Code of Conduct, as well as Board committee charters, specifically set forth the duties and obligations that Wells Fargo Board members and/or officers are required to fulfill on behalf of the Company.

57.     Wells Fargo maintains a code of conduct that it calls "the Code of Ethics and Business Conduct" (the "Code").  The Code applies to "all employees, including officers, as well as directors of Wells Fargo & Company and its subsidiaries, regardless of location or employee classification."  The Code requires, among other things:

a.     Be "accountable for complying with the Code, as well as all corporate and business policies and applicable laws, rules, and regulations that apply to us."

b.     Fulfill "a responsibility to protect the reputation and integrity of Wells Fargo" by using different reporting options to report "illegal or unethical behavior involving Wells Fargo, including possible violations of this Code, or violations of laws, rules or regulations—whether it relates to you, your manager, a coworker, a customer or a third-party service provider—or if you have a question or need help making an ethics or compliance decision[.]"

c.     Record matters properly.

d.     Be "candid and transparent" in communications.

e.     "[B]e honest and fair in our dealings and communications with our customers."

f.     Be "committed to following all applicable laws, rules and regulations that apply to our businesses."

g.     "[N]ever buy or sell securities when you have material, nonpublic information."

58.     Furthermore, the Code specifically warns against retaliation: "We do not engage in or tolerate retaliation of any kind against anyone for providing information in good faith (or otherwise in accordance with applicable country-specific laws) about suspected unethical or illegal conduct, including fraud; securities law or regulatory violations; possible violations of any Wells

Fargo policies (including this Code); other inappropriate workplace behavior; or concerns regarding accounting, internal accounting controls, or auditing matters."

59.    Moreover, "Violation of the provisions of this Code or the referenced policies and guidelines is grounds for corrective action, which may include termination of your employment. Certain actions may also result in legal proceedings, including prosecution for criminal violations."

60.    Furthermore, Wells Fargo maintains "Corporate Governance Guidelines" that further explain the duties of the Board, which include, among other things:

> i.    reviewing, monitoring and, where appropriate, approving the Company's strategic plan, risk tolerance, risk management framework, and financial performance, including reviewing and monitoring whether the strategic plan and risk tolerance are clear and aligned and include a long-term perspective on risks and rewards that is consistent with the capacity of the Company's risk management framework;

> ii.    reviewing, monitoring and approving the Company's significant policies, programs, and plans, including whether they are consistent with the Company's strategic plan, risk tolerance, and risk management capacity.

> iii.    selecting, and engaging in succession planning for, the Company's Chief Executive Officer and, as appropriate, other members of senior management;

> iv.    monitoring and evaluating the performance of senior management, and holding senior management accountable for implementing the Company's strategic plan and risk tolerance and maintaining the Company's risk management and control framework;

> v.    monitoring and evaluating the alignment of the compensation of senior management with the Company's compensation principles;

> vi.    maintaining a Board composition, governance structure, and practices that support the Company's risk profile, risk tolerance, and strategic plan, including having directors with diverse skills, knowledge, experience, and perspectives, and engaging in a periodic self-evaluation process of the Board and its committees;

> vii.    managing and evaluating the information flow to the Board, including by working in consultation with management in setting the Board and committee meeting agendas and schedules, to facilitate the Board's ability to make sound, well-informed decisions by taking into account risk and opportunities and to facilitate its oversight of senior management; and

> viii.    supporting the stature and independence of the Company's independent risk management (including compliance), legal, and internal audit functions, reinforcing a culture of ethics, compliance and risk management, and overseeing the processes adopted by senior management for maintaining the integrity and reputation of the Company.

61. The Board carries out its oversight responsibilities directly and through the work of its committees.

**B.    Additional Duties of Board Committees**

62. The Board has delegated additional responsibilities to several of its standing committees.

63. The Audit Committee's overall oversight responsibility is for:

- the integrity of the Company's financial statements and the adequacy and reliability of disclosures to shareholders and bank regulatory agencies, including management activities related to accounting and financial reporting and internal controls;

- the qualifications and independence of the Company's independent registered public accounting firm (the 'independent auditor') and the activities and performance of the independent auditor and the internal audit function;

- the Company's compliance with legal and regulatory requirements; and

- reputation risk related to the Committee's responsibilities described in this Charter.

64. The Audit Committee's specific responsibilities include, among other things:

a.    Reviewing SEC filings and internal audit reports;

b.    Oversee an independent auditor and internal audit;

c.    Reviewing the Company's risk compliance program;

d.    Reviewing the Company's "legal matters and emerging legal trends that may have a material impact on the financial statements and any material reports or inquiries received regarding investigations by regulators or governmental agencies[;]" and

e.    Make regular reports to the whole Board.

65. The Corporate Responsibility Committee ("CRC") has an overall responsibility to "to assist the Board of Directors in fulfilling its responsibilities to oversee the Company's significant strategies, policies, and programs on social and public responsibility matters and the Company's relationships and enterprise reputation with external stakeholders on those matters" by, among other things, conducting the following:

1.    The CRC shall oversee the Company's significant strategies, policies, and programs on social and public responsibility matters, including

15

environmental sustainability and climate change, human rights, and supplier diversity.

2.      The CRC shall oversee the Company's significant Government Relations strategies, policies, and programs.  The CRC will monitor and receive updates on the alignment of the Company's political activities and contributions, significant lobbying priorities, and principal trade association memberships with the Company's public policy objectives.

3.      The CRC shall oversee the Company's community development and reinvestment activities and performance.

4.      The CRC shall oversee the Company's social impact and sustainability strategy and impacts through the support of non-profit organizations by the Company or a Company-sponsored charitable foundation.

5.      The CRC shall monitor the state of the Company's relationships and enterprise reputation with external stakeholders on social and public responsibility matters.

6.      The CRC shall review shareholder proposals related to social and public responsibility matters.

7.      In performing its responsibilities, the CRC is authorized to obtain advice and assistance from internal or external legal, accounting, or other advisors at the Company's expense without prior permission of the Board or management.

8.      The CRC may, in its discretion, form and delegate all or a portion of its authority to subcommittees.

9.      The CRC shall perform such other duties and responsibilities consistent with this Charter or as otherwise requested by the Board.

10.      The CRC shall document and maintain records of its proceedings, and shall make regular reports to the Board summarizing the matters reviewed and actions taken at each CRC meeting.

11.      The CRC shall annually review and assess the adequacy of this Charter.  The CRC may recommend amendments to this Charter at any time to the Governance and Nominating Committee [. . .] and the GNC may recommend changes to the Board for approval.  The CRC shall annually review its own performance.

66.      The Governance and Nominating Committee is responsible for director selection and evaluation, as well as "overseeing the Company's engagement with shareholders and other interested parties concerning governance and other related matters" and "overseeing reputation risk related to the GNC's responsibilities described in this Charter."

67.      The Human Resources Committee ("HRC") is responsible for, among other things, the Company's compensation design, which includes:

- •        approve the Company's compensation philosophy and principles;

- •        oversee executive compensation, including to conduct the annual [CEO] performance evaluation process;

- •        evaluate and approve compensation plans, policies, and programs applicable to executive officers;

- •        oversee the Company's incentive compensation risk management program, human capital risk, and human capital management, including succession planning;

- •        oversee the Company's culture and Code of Ethics and Business Conduct;

- •        oversee compensation-related reporting and proposals as required under [SEC] rules; and

- •        oversee reputation risk related to the HRC's responsibilities described in this Charter.

68. The HRC further has broader responsibilities to "oversee the Company's human capital risk and human capital management, including performance management; talent management; diversity, equity, and inclusion; pay equity; and succession planning for the CEO and other senior executives as determined by the HRC." Furthermore, "[t]he HRC shall oversee the Company's culture, including management's efforts to foster ethical behavior and decision-making throughout the Company and the Company's Code of Ethics and Business Conduct and any significant changes or exceptions thereto." In addition, "[t]he HRC shall review shareholder proposals related to human capital, executive compensation, and other matters subject to HRC oversight."

69. The Risk Committee is responsible for assisting the Board with "fulfilling its responsibilities to oversee the Company's company-wide risk management framework and Independent Risk Management function, including the significant programs, policies, and plans established by management to identify, assess, measure, monitor, and manage the material risks facing the Company, including compliance risk (includes conduct risk and financial crimes risk), model risk, operational risk (includes business resiliency and disaster recovery risk, data management risk, information security risk and cybersecurity risk, and technology risk), credit risk, interest rate risk, liquidity risk, market risk, reputation risk, and strategic risk." Furthermore,

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

the Risk Committee "shall assist the Board of Directors in overseeing risk across the entire Company and coordinate with the other Board committees that have primary oversight for certain risk types."

70.     Ultimately, the Board is responsible for numerous areas of oversight, whether sitting as a whole board of directors or in committee.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Wells Fargo Has a Long History of Engaging in Wrongful Corporate Conduct, Particularly over the Past Decade

71.     Wells Fargo has been at the center of numerous high-profile scandals over the past few years, and it continues to be under intense scrutiny from regulators.  Most notably, Wells Fargo was found to have created over three million fake accounts and opened credit cards for customers without their knowledge or consent.  Wells Fargo has also been subject to investigation by the DOJ for possible violations related to its mortgage lending practices during the financial crisis, as well as potential improper sales practices in its wealth management arm.  Additionally, the bank recently agreed to a settlement with the Consumer Financial Protection Bureau ("CFPB") over allegations that it charged auto loan borrowers "unfairly high interest rates" without properly disclosing them.

72.     Specifically, in 2016, the Company was found to have opened and charged fees on up to 3.5 million unauthorized accounts.  In 2018, the Company was assessed a $1 billion fine by the CFPB for charging customers for auto insurance they didn't need and wrongfully denying mortgage modifications to eligible borrowers.  The settlement with the CFPB provides for a total of $480 million in consumer relief.

73.     In addition to its financial penalties, Wells Fargo also faced criticism for its corporate culture and the lack of accountability among its top executives.  The Company was accused of creating an environment where unethical practices were encouraged, with employees facing immense pressure to meet sales targets by any means necessary.  After a lengthy investigation into the Company's activities, the Federal Reserve imposed unprecedented

1   restrictions on Wells Fargo's growth and governance as punishment in 2018.  This included

2   replacing four members of its Board and removing former CEO Tim Sloan from office.

3       74.    The Company's scandals continued when it was revealed that employees had

4   forged documents in order to meet sales goals which resulted in an additional fine of $575 million

5   being imposed by all 50 states and Washington, D.C.  In the case of the forged documents, the

6   Company agreed to pay restitution to customers affected by the scandal, offer free credit

7   monitoring services, and provide additional transparency with regards to its sales practices.

8       75.    To add to Wells Fargo's troubles, it was also found to have been selling insurance

9   policies without proper disclosure or customer consent, as well as engaging in improper mortgage

10  practices.  In response to these investigations, the Federal Reserve imposed an additional

11  restriction on the Company's ability to grow beyond a certain size until it could prove that it had

12  taken sufficient remedial measures.

13      76.    In addition, in 2020, Wells Fargo agreed to a $3 billion settlement with the DOJ

14  and with the SEC related to its sales practices.  As part of the agreement, Wells Fargo

15  acknowledged that it had misled investors about the quality of its loan portfolios during the

16  financial crisis and failed to inform them of the risks associated with certain investments.  The

17  Company also paid out millions in fines for misleading customers about fees associated with home

18  loans, debit cards, and other banking services.

19      **B.    Wells Fargo Has Also Repeatedly Engaged in Serious and Flagrant
        Discriminatory Conduct**

20      77.    Wells Fargo has also repeatedly been charged with discriminating against

21  minorities, women, people with disabilities, and veterans in hiring and lending.  In 2012, the

22  Company agreed to pay $175 million to settle lawsuits that alleged it had denied mortgages to

23  African American and Latino borrowers at higher rates compared to White borrowers.  In 2013,

24  Wells Fargo was also found to have discriminated against women by paying them less than male

25  counterparts with similar job titles and experience levels.

26      78.    In 2006, a lawsuit, styled *U.S. ex rel. Bibby, et al. v. Wells Fargo Bank, N.A., et al.*,

27  No. 1:06-00547 (N.D. Ga.), was filed alleging that Wells Fargo, among other named defendant

28

1    banks and lenders, charged military veterans hidden fees to refinance their mortgages, and

2    concealed the fees when applying for federal loan guarantees.  In that lawsuit, plaintiffs alleged

3    that Wells Fargo, among the other named defendants:

> [R]epeatedly violated the rules of the [Interest Rate Reduction Refinancing Loans (IRRRL)] program.  Rather than comply with those rules, [Wells Fargo and the other defendant lenders] over-charged veterans, charged unallowable fees, and then deliberately concealed those facts from the [Veterans Administration (VA)] to obtain taxpayer-backed guarantees for the loans, which would not have been available but for that concealment.  At the same time, Defendant lenders falsely certified to the VA, in writing, that they were not charging unallowable fees. . . .  Defendant lenders have submitted hundreds of thousands of false and fraudulent documents, records and claims to the United States to fraudulently induce the VA to guarantee IRRRL loans.  Tens of thousands of those IRRRL loans have gone into default or resulted in foreclosure, which has resulted in massive damages.
>
> Ultimately, this lawsuit would result in a massive settlement wherein Wells Fargo is to pay $108 million to the U.S. government to settle the claims.

12    79.    In 2018, Wells Fargo reported that the DOJ had opened investigations into

13    allegations of Wells Fargo discriminating against disabled customers with their banking fees and

14    services.  In addition, in 2018, the CFPB ordered Wells Fargo to pay an additional $575 million in

15    fines for discrimination against minority borrowers over the past decade.  The CFPB also issued a

16    cease-and-desist order, requiring the Company to take immediate steps to end its discriminatory

17    practices.

**C.    The Wells Fargo Scandals Have Caused Regulators to Impose an Asset Cap**

19    80.    The continued scandals and negligence at Wells Fargo have resulted in regulators

20    imposing an asset cap on the bank.  The CFPB, OCC, and Federal Reserve jointly restricted Wells

21    Fargo's ability to grow its assets beyond $1.9 trillion in 2018.  The regulators also imposed a ban

22    on issuing new mortgages and auto loans until the bank can prove that it has improved its risk

23    management and compliance standards.  This asset cap is expected to remain in place until at least

24    2024.

25    81.    In addition, the Federal Reserve conducted a review of Wells Fargo's Board and

26    found that "[t]he [Company] did not have an effective firm-wide risk management framework in

27    place that covered all key risks.  This prevented the proper escalation of serious compliance

28    breakdowns to the board of directors."  The Federal Reserve then ordered the Company to replace

1    four independent members of its Board by April 2019.  This action was taken in an effort to ensure

2    better oversight of the bank's management and practices.  The Company is also required to submit

3    regular progress reports to regulators.  As recently as February 2020, Wells Fargo was fined $3

4    billion for "pervasive misconduct" related to its mortgage business.  The fine was in addition to a

5    prior settlement from 2018 involving fraudulent accounts opened in customers' names without

6    their knowledge or permission.

      **D.**     **Wells Fargo Hired Charles Scharf as Its New CEO, Who Claims that He Will Reform the Corporate Controls and Oversight Practices**

7
8    82.    In an attempt to clean up its image, Wells Fargo hired Charles Scharf as its new

9    CEO in October 2019 to address the Company's scandals and reform its corporate controls and

10   oversight practices.  In his first town hall as CEO, Scharf urged Wells Fargo employees: "We all

11   have to demand more from each other.  The seriousness of what we do brings tremendous

12   responsibility.  Our work has tremendous impact upon people.  We need to recognize that and

13   make sure that we're doing everything we can to operate the company to the highest standards of

14   operational excellence."

15   83.    Scharf claims that he has caused Wells Fargo to take several steps to reform the

16   Company's practices.  In a January 2020 memorandum to employees, Scharf acknowledged that,

17   with regard to the fake-account scandal, Wells Fargo "did not have in place the appropriate people,

18   structure, processes, control, or culture to prevent the inappropriate conduct."  He further noted,

19   "This was inexcusable."  He reaffirmed his commitment to restoring trust in the bank and to

20   "committing all necessary resources to ensure that we operate with the strongest business practices

21   and controls, maintain the highest level of integrity, and have in place the appropriate culture."

22   84.    On an earnings call in March 2020, Scharf reiterated, "[W]e're not reducing our

23   efforts on our regulatory commitments, and we continue to move forward on improving the

24   processes, structure and cultural change necessary to get the work done."

25   85.    Scharf also claimed that Wells Fargo had improved its policies and controls to

26   ensure that senior executives and the Board would receive important information.  In April 2020,

27   Wells Fargo announced it would disclose more information about its risk management practices

28

and controls in its filings with the SEC.  This includes providing greater detail on its credit exposures and financial instruments, as well as disclosing details of any material incidents that have occurred since 2018.  Additionally, Scharf said the Company will provide more clarity around executive compensation by providing investors with an explanation of pay decisions.

**E.    Wells Fargo's Internal Controls Fail as Its Banks Continue to Discriminate Against Black and Minority Borrowers**

86.    Scharf has failed to correct Wells Fargo's past practices that led to ten-figure fair-lending settlements with the United States government.  In addition to facts revealed in numerous lawsuits by cities and individuals, investigative journalism has demonstrated that Wells Fargo continues to discriminate against Black and Minority Borrowers.

87.    On March 11, 2022, *Bloomberg* published an investigative report showing that Wells Fargo approved a smaller percentage of Black homeowners' refinancing applications than other groups; moreover, Wells Fargo's refinancing approval rate for Blacks was lower than all other lenders.  Furthermore, while the trend was slightly less pronounced, Wells Fargo also approved a lower percentage of Asian and Hispanic borrowers' refinancing applications than White borrowers, and again Wells Fargo's approval percentages for these groups was lower than for all other lenders.

88.    Particularly striking, *Bloomberg* reported that Wells Fargo rejected more than *half* of Black refinancing applications.  Whereas Wells Fargo approved 72% of White refinancing applications, Wells Fargo only approved 47% of Black borrowers' applications.  Wells Fargo also approved only 53% of Hispanic borrowers' applications.  Wells Fargo approved 67% of Asian applications.  By contrast, other lenders approved: 87% of White refinancing applications; 85% of Asian applications; 79% of Hispanic applications; and 71% of Black applications.  The severe gap of Hispanic or Black applications compared to White applications, which was a much larger percentage difference than the overall lower application approval Wells Fargo made, could not be explained by Wells Fargo's comparatively more stringent criteria.

89.    *Bloomberg* not only pointed out that Wells Fargo "had the biggest disparity" between Black and White approval rates compared to any other lender, but also noted that Wells

1    Fargo "was alone in rejecting more Black homeowners than it accepted." *Bloomberg*'s analysis

2    showed a similar level of discrimination against Hispanic borrowers, as well as discrimination

3    against Asian applicants.

4           90.     Moreover, Wells Fargo's open discrimination against all minorities, but especially

5    Blacks and Hispanics, has real-world consequences in destroying the opportunity for minorities to

6    build wealth.  Increasing interest rates are leading to the loss of any opportunity to refinance

7    mortgages at relatively favorable rates, leading to massive losses of potential savings.  In 2020

8    alone, due to more favorable rates, the Federal Reserve has estimated that White homeowners

9    saved an estimated \$3.8 billion annually by refinancing their mortgages then.  Thus, the lower

10   rates of approval for Blacks, Hispanics, and Asians are costing these groups billions of dollars

11   annually.

12          91.     Wells Fargo did not dispute *Bloomberg*'s statistical analysis.  Instead, Wells Fargo

13   sought to excuse its discrimination by claiming that it had reviewed its 2020 refinancing decisions,

14   and vaguely referenced "additional, legitimate, credit-related factors" for the disparities.  But

15   *Bloomberg* found that even when taking Wells Fargo's relative selectivity into account, it "had by

16   far the worst record among major lenders when it came to refinancings by Black homeowners[.]"

17   Given the comparable gaps for Hispanics, it would appear that Wells Fargo's general and vague

18   excuses would also not apply to that group.  Even for Asians, the fact that in percentage points

19   Wells Fargo had twice the gap between Asian and White borrowers as other major lenders makes

20   it highly likely that Wells Fargo's excuses do not apply to that group, either.

21          92.     *Bloomberg* also further analyzed Wells Fargo's data compared to its largest rivals,

22   and still found this troubling gap for Black borrowers (*Bloomberg* did not expressly analyze

23   Hispanic or Asian borrowers, but given its general findings, the same gap likely applies to these

24   groups, too). *Bloomberg* found: JP Morgan accepted 81% of refinancing applications from Black

25   homeowners in 2020 compared with 90% from White homeowners; Bank of America approved

26   78% of White applications and 66% of Black applications; Rocket Mortgage, which had the largest

27   volume of refinancing applications, approved 86% of White borrowers versus 79% of Black

28

1  applicants.  By contrast, Wells Fargo approved 72% of White refinancing applications and only

2  47% of Black applications.

3      93.    Moreover, *Bloomberg* showed that Wells Fargo's discrimination has only

4  **worsened** over the last decade.  *Bloomberg* found: "Among major lenders, only Wells Fargo

5  approved a smaller share of refinancing applications from Black homeowners in 2020 than a

6  decade earlier."  Furthermore, Wells Fargo's "47% approval rate was its second lowest during the

7  past decade."

8      94.    As a likely result of Wells Fargo's discrimination, a huge portion of Black

9  borrowers were discouraged from completing their applications: 27% of Black borrowers who

10  began an application withdrew it, so only **one-third** of Black homeowners who sought refinancing

11  were successful.

12      95.    Nor can income gaps explain Wells Fargo's disparity between White and Black

13  borrowers.  In fact, "Wells Fargo approved a greater share of applications from low-income White

14  homeowners than all but the highest-income Black applicants, who had an approval rate about the

15  same as White borrowers in the lowest-income bracket."

16      96.    At the time of *Bloomberg*'s report, data for 2021 had not been released.

17      97.    Wells Fargo's discrimination is especially egregious in that, in 2012, it had paid

18  $184 million to the U.S. government, to settle claims that it unfairly steered Black and Hispanic

19  homeowners into subprime mortgages and charged them higher fees and interest rates.  Thus,

20  Wells Fargo's refusal to refinance mortgages with inflated fees and rates destroyed comparatively

21  even more wealth for Black and Hispanic borrowers than for White borrowers.

22      98.    Wells Fargo's huge disparity is *ipso facto* proof of discrimination, because as

23  *Bloomberg* pointed out, disparate-impact analysis applies to fair-lending claims.  Thus, regulators

24  can prove discrimination based in large part on the statistical analysis, rather than demonstrate

25  deliberate discrimination.

26      99.    Wells Fargo also discriminates against Black new borrowers by approving them at

27  much lower rates than White borrowers for new loans.  According to the class action, *Williams v.*

28  *Wells Fargo Bank, N.A.*, Case No. 3:22-cv-00990-JD (N.D. Cal. Apr. 14, 2022), Am. Compl.,

24

analysis of public data published under the Home Mortgage Disclosure Act ("HMDA") from 2020 shows that while Wells Fargo approved 67.1% of White borrowers for new mortgages, it only approved 51.8% of Black borrowers.  These discrepancies are more than 29 standard deviations from the expected random result, and thus cannot be explained by mere chance.  Furthermore, Wells Fargo approved mortgage rates at 3.34% for Black borrowers, which was 17 standard deviations apart from the average of 3.23% for White borrowers.

100.    Furthermore, the *Williams* litigation alleged, based on the personal experience of one of the class action plaintiffs, that Wells Fargo used a "unique scoring model" that exacerbated evaluation criteria that tended to disfavor Black borrowers, thus heightening the bias against them in approving loans.  In addition, the *Williams* litigation alleges, again based on plaintiffs' personal experiences, that Wells Fargo would give Black borrowers more skeptical and greater scrutiny, which further led to lower approval rates.  The *Williams* litigation also alleged, based again on plaintiffs' personal experiences, that Wells Fargo would pressure Black borrowers to increase the rates of their loans, take them into default, and institute improper foreclosures.

101.    The *Williams* litigation is only the latest in a long series of discrimination suits, as described above.  Wells Fargo has paid out hundreds of millions of dollars in settlements to avoid fully litigating redlining claims, including a $440 million settlement with the City of Memphis and Shelby County in Tennessee.  Most famously, as described above, Wells Fargo settled for $175 million and a consent decree with the DOJ on FHA claims that Wells Fargo engaged in "reverse redlining" by charging higher rates and imposing less favorable terms on Black and Hispanic borrowers.

102.    Evidence of Wells Fargo's systematic discrimination against borrowers is further bolstered by numerous accounts of how its employees discriminate against Black borrowers.  In *The White Wall: How Big Finance Bankrupts Black America* (2022), *The New York Times* reporter, Emily Flitter, detailed several of these egregious discriminatory instances, including numerous instances when Wells Fargo employees refused to let Black customers withdraw money from their own accounts, and threatened to call the police when the customers protested, in branches across the country.

103.    In June 2022, as Wells Fargo faced scrutiny for sham interviews, explained *infra*, its diversity officer, Kleber Santos, was asked about the *Bloomberg* report showing an exceptionally high rejection rate of Black borrowers.  Santos, in remarks that echoed Scharf's remarks regarding a lack of a pipeline, insisted that the *Bloomberg* report actually reflected well on Wells Fargo: Santos claimed that the rejections were based on Fannie and Freddie Mac guidelines, and that the rejection percentages were higher because Wells Fargo had more applicants.

**F.    Wells Fargo Committed to Programmatic Relief to Settle Major Regulatory and Civil Discrimination Actions**

104.    Wells Fargo has also settled several major actions alleging discrimination against its employees or job applicants.  Beyond paying monetary damages, Wells Fargo has made extensive programmatic commitments to improve its hiring and retention of diverse employees.

105.    In 2017, Wells Fargo settled a class action alleging discrimination against Black brokers for $35 million and programmatic relief.  Even five years later, in 2022, plaintiffs' counsel in that action have complained that Wells Fargo has yet to complete implementing the programmatic relief.

106.    In 2020, Wells Fargo settled an action brought by the DOL alleging discrimination against almost 35,000 Black job applicants.  Wells Fargo paid almost $8 million in back pay and interest, and also agreed to a set of practices to prevent hiring discrimination going forward.

107.    In the wake of these actions, one programmatic relief that Wells Fargo began to implement was a Diverse Search Requirement, whereby it would commit to having diverse candidates in every applicant pool for certain types of positions, as well as have at least one diverse interviewer per position.  However, as discussed *infra*, Wells Fargo perverted this policy into one where diverse candidates would be given sham interviews, where a position had already been filled.

1    **G.    Wells Fargo Purported to Improve Its Diversity Recruitment Efforts**

2    108.    In an attempt to turn the narrative around its persistent course of illegal conduct,

3    and in particular its history of discrimination against both its customers and employees, Wells

4    Fargo announced or implemented several diversity initiatives shortly after Scharf became the CEO.

5    109.    In January 2020, Wells Fargo's non-profit arm, the Wells Fargo Foundation,

6    announced it would commit $17.4 million to funding community development financial

7    institutions as part of its Diverse Community Capital Program, which "is expected to create an

8    opportunity for more than 30,000 new loans to diverse entrepreneurs."

9    110.    In February 2020, Wells Fargo touted that it "will no longer require arbitration for

10   employees in connection with any future sexual harassment claims."  It framed this policy change

11   as part of its "zero tolerance for sexual harassment[.]"

12   111.    In March 2020, Wells Fargo announced a commitment to invest up to $50 million

13   in "African American Minority Depository Institutions[,]" which include "community based

14   banks," as part of Wells Fargo's commitment to "support[] economic growth in African American

15   communities[.]"   Wells Fargo touted that this new "investment complements Wells Fargo's

16   Diverse Community Capital (DCC) program, a five-year, $175 million program to empower

17   diverse small business owners with greater access to capital and technical assistance so they can

18   grow and sustain local jobs."

19   112.    In the spring of 2020, Wells Fargo implemented a recruitment policy it called the

20   "Diverse Search Requirement."   It touted this policy when responding to diversity-oriented

21   stockholder proposals to reassure stockholders that they need not ask for other diversity

22   requirements because the Diverse Search Requirement already went beyond that.  The Diverse

23   Search Requirement required that for positions with total direct annual compensation of above

24   $100,000, each interviewer slate would include at least one diverse member and each applicant

25   pool would include at least 50% diverse candidates.  "Diverse" was defined to mean "diversity

26   dimensions" along "race/ethnicity, gender, LGBTQ, veterans, and people with disabilities."

27   113.    Wells Fargo's well-calculated public relations effort had hiccups when Scharf

28   revealed his own biases publicly.  In September 2020, comments Scharf had made in an internal

1  memo during the summer were made public.  Scharf had blamed the lack of progress in improving

2  diversity at the Company on a "very limited pool of black talent to recruit from[.]"  When these

3  remarks became public a few months later, they led to quick and widespread public backlash.  In

4  an attempt to walk back his comments, Scharf apologized for his "insensitive comment reflecting

5  [his] own unconscious bias" and announced a series of new DEI initiatives.  Wells Fargo would

6  expand outreach efforts to historically Black colleges and universities, as well as Hispanic-serving

7  institutions.  Wells Fargo would also implement a "new live anti-racism training course" for its

8  employees.  Wells Fargo was also working on integrating diversity and inclusion into various

9  aspects of its operations.  Finally, Wells Fargo would make compensation for its operational

10  executives depend in part on their achieving diversity and inclusion goals: "Operating Committee

11  members will be evaluated based upon their progress in improving diverse representation and

12  inclusion in their area of responsibility.  These evaluations will have a direct impact on year-end

13  compensation decisions."

14       114.    To further burnish its public image for attempting to improve diversity, in

15  November 2020, Wells Fargo announced that it was hiring Kleber Santos as its "head of the newly

16  created Diverse Segments, Representation and Inclusion group."  Santos, who was a senior

17  executive at Capital One, stated that he "look[s] forward to joining Wells Fargo and leveraging

18  [his] business background and experience to promote and embed a diversity mindset into

19  everything that we do."  Santos reports directly to Scharf.

20       115.    One initiative Wells Fargo touted starting in 2020 was its Diverse Search

21  Requirement.  The policy was established as an unwritten policy as part of the programmatic relief

22  of the settlement reached in *Slaughter v. Wells Fargo Advisors, LLC*, No. 1:13-cv-06368 (N.D. Ill.

23  Sept. 5, 2013).  The policy was formally written down in early 2020, after Scharf joined as CEO

24  and made diversity a priority to the Company.

25       116.    The Company and its officers repeatedly touted this policy in securities filings

26  starting in March 2020.  In its March 2020 Proxy, the Company announced a number of DEI

27  initiatives, including "requiring diverse candidate slates and interview teams for all roles at Wells

28  Fargo with total direct compensation of more than $100,000[.]"

117.    In September 2020, after Scharf faced criticism for blaming Wells Fargo's lack of diversity on an insufficient pipeline of Black talent, he again reiterated the Diverse Search Requirement in a press release: "we are requiring diverse candidate slates for key roles with compensation of more than $100,000."

118.    Scharf and Wells Fargo stepped up their efforts to promote the Diverse Search Requirement in late 2020, when the Company faced a shareholder proposal for the Board to "adopt a policy for improving workforce diversity by requiring that the initial pool of candidates from which new employees are hired by the Company in the U.S. shall include at least one qualified woman and one ethnically or racially diverse candidate[.]"   The shareholder proposal was expressly motivated by Scharf's comments in late 2020 about the lack of a pool of qualified Black job candidates.

119.    In opposing the shareholder proposal, Wells Fargo specifically touted its Diverse Search Requirement.  Wells Fargo filed a letter with the SEC, asking for permission to not include the proposal on the ballot, because Wells Fargo claimed that its Diverse Search Requirement already "substantially implemented" what the proposal called for.

120.    Wells Fargo also spoke to the shareholders who made the proposal, which culminated in a January 2021 agreement where Wells Fargo would provide more details about the Diverse Search Requirement in disclosures, and the shareholders withdrew their proposal.

121.    Wells Fargo continued to tout its Diverse Search Requirements in other SEC filings and published reports, and its executives continued to tout the Diverse Search Requirement in their public statements, including:

     a.    In its 2020 Annual Report filed on Form 10-K on February 23, 2021, Scharf's shareholder letter touted the Company's "expanded commitments to" including "requiring a diverse slate of candidates – and a diverse interview team – for most roles with total direct compensation of more than $100,000 per year."

     b.    In its 2021 Proxy filed on March 16, 2021, Wells Fargo stated that it is "expanding [its] diversity and inclusion commitments with a focus on hiring, promotions, and turnover, with increased accountability across all these areas and are taking specific actions in support of these commitments."   These include "requiring a diverse slate of candidates – and a diverse interview team – for most roles with total direct compensation of more than $100,000 per year."  Wells Fargo described the Diverse Search Requirement in a further section of the 2021 Proxy:

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

Consistent with our commitment to advance diversity, equity, and inclusion (DE&I) and improve workforce diversity, Wells Fargo has established Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates and interview teams (referred to as our Diverse Search Requirement). Our Diverse Search Requirement was originally implemented based on our evaluation of the Company's workforce in order to determine how best to improve workforce diversity. Based on our ongoing review, the Company decided to expand the scope of the Diverse Search Requirement in 2020 as part of our overall and continuing efforts to enhance workforce diversity. We define diversity for these purposes to include the following diversity dimensions: race/ethnicity, gender, LGBTQ, veterans, and people with disabilities.

The Diverse Search Requirement requires the following for most U.S. roles with total direct compensation greater than $100,000:

• At least 50% of interview candidates must be diverse with respect to at least one diversity dimension; and

• At least one interviewer on the hiring panel must represent at least one diversity dimension.

c. On April 26, 2021, Wells Fargo published a report, *2020 Social Impact and Sustainability Highlights*. Wells Fargo highlighted DEI initiatives, including the Diverse Search Requirement:

To be successful, we must continue to create a truly diverse and inclusive workforce that brings a wide range of insights and perspectives to all levels of our company. Our Diverse Search Requirement requires that for most U.S. roles with total direct compensation greater than $100,000, at least 50% of interview candidates must be diverse with respect to at least one diversity dimension. Further, at least one interviewer on the hiring panel must represent at least one diversity dimension. For these purposes, our definition of diversity includes race/ethnicity, gender, LGBTQ, veterans, and people with disabilities. We're expanding this program internationally. As of December 31, 2020, the Diverse Search Requirement:

• Applied to approximately 95% of all U.S. roles with total direct compensation greater than $100,000; and

• Applied to approximately 48% of all active U.S. employees irrespective of their total direct compensation.

• 91% of applicable requisitions had a diverse interview slate [and]

• 94% of applicable requisitions had a diverse interview team.

d. On May 16, 2021, Scharf testified to Congress that, concerning Wells Fargo's commitment to DEI, "for the hiring of many senior roles, we have implemented guidelines that require a diverse slate of candidates (at least 50 percent) and a diverse interview panel."

e. In its July 15, 2021 public ESG Report, Wells Fargo stated that the Company "[r]equire[s] diverse candidate slates and interview teams for key roles with total direct compensation of more than $100,000." Furthermore, "[i]n the U.S., we now require that at least 50% of interview candidates identify with at least one diversity dimension — and we require a diverse team of interviewers — for most roles with total direct compensation of more than $100,000. Outside the U.S.,

we have country-specific strategies in place to ensure that we're considering diverse candidate slates for executive-level roles."

f.      On October 7, 2021, Sanchez elaborated on the Diverse Search Requirement in a talent workshop: "[W]e have really focused a lot on the external sourcing and making sure that we are proactively sourcing for building diverse candidate slates. . . .  [W]e formalized the candidate slate requirement for roles $100K and above.  It's probably about a year and a half or two years ago to say that you have to have 50% of the slate -- of the candidate slate that will be interviewed needs to be diverse in one dimension or another.  Also, the interview team has to diverse, and so that's very important as well."  Sanchez continued: "But I think the core for us and what's key is not to sit back and wait and see who arrives in that candidate pool, but to be constantly targeting external as well as internal sourcing to make sure that the pipeline is filled with great candidates.  And we'll identify with the recruiters who work hand-in-hand with our diversity sourcing group."

g.      On February 15, 2022, in its "Priority Recommendations of the Wells Fargo Human Rights Impact Assessment and Actions in Response," Wells Fargo stated: "In 2021, we increased our partnerships with colleges, universities, and other organizations spotlighting diverse talent recruitment.  For example, by expanding our engagement we increased our hiring of candidates from Historically Black Colleges and Universities and Hispanic- Serving Institutions.  We also instituted diverse candidate slates and interview teams on most jobs of over $100,000 in total compensation."

h.      On March 14, 2022, Wells Fargo filed its 2022 Proxy, where it stated:

Our DE&I commitments include a focus on hiring, promotions, and retention, and have been designed with increased accountability across those areas.  These include: Diverse Candidates[:] Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates and interview teams for designated posted positions.  We define diversity for these purposes to include the following diversity dimensions: race/ethnicity, gender, LGBTQ, veterans, and people with disabilities. We conduct and track targeted outreach efforts to underutilized populations in order to attract well-qualified individuals to apply for open positions and identify placement goals to help focus recruitment strategies toward underrepresented groups.  We seek to recruit the best and brightest talent with a keen focus on diversity for senior-level roles.  [We] pursue this goal by establishing trusted partnerships with candidates, hiring managers, and recruiting consultants.

i.      On June 1, 2022, after the initial *Times* report, Wells Fargo published its first DEI Report, "[f]or most posted roles in the U.S. with total direct compensation greater than $100,000 per year, Wells Fargo requires that at least 50% of the interview candidates must represent a historically under-represented group with respect to at least one diversity dimension and at least one interviewer on the hiring panel must also represent a historically under-represented group with respect to at least one diversity dimension."

## H.      Wells Fargo Reveals that It Views Diversity as Mere Box Checking by Conducting "Sham" Interviews

122.    In May 2022, a Wells Fargo branch manager, Bruno, blew the whistle to reveal that Wells Fargo was more concerned about papering a record for diversity instead of actually hiring a

diverse workforce.  His account was reported in *The New York Times*, which corroborated his account with those from other former and current Wells Fargo employees.  Bruno and others revealed, through the *Times*, that Wells Fargo systematically conducted interviews with minority candidates who the Company had no intention of hiring because the position was already filled.  Bruno detailed how Wells Fargo would offer interviews to "diverse" candidates – which meant LGBTQ, racial minority, or women applicants – ***after*** the job had already been offered to a White candidate.

123.    Bruno eventually refused to conduct sham interviews, and when he complained about these practices to management, they dismissed his claims.  Then, in August 2021, Wells Fargo fired Bruno.

124.    But Bruno was not a malcontent.  Rather, as reported in the press, many other Wells Fargo employees have corroborated Bruno's account.  *The New York Times*, for example, in its initial report of Bruno's concerns, corroborated his account by reporting that six other current or past Wells Fargo employees were asked to interview diverse candidates for jobs where the position was already filled; the *Times* also reported that five other employees or ex-employees either helped arrange sham interviews or knew of the practice.

125.    In the initial *Times* report, another executive, Tony Thorpe, also went on the record to discuss how even though he was not explicitly told to conduct a "fake" interview, he was instructed to reach out to minority communities and document that he had tried to find a "diverse pool" of job candidates even when he knew exactly who would be getting the jobs.

126.    The *Times*, in its initial reporting, also provided a regulatory motive for why Wells Fargo would engage in these sham interviews.  The interviews were conducted to paper Wells Fargo's record for diversity, in anticipation of regulatory audits.  The *Times*' initial report focused on Wells Fargo's wealth management unit.

127.    Wells Fargo initially attempted to blame sham interviews on a few employees from years ago, and noted that its management had largely turned over in 2020.  However, the *Times* and other media followed with reports that showed that the practice was still going on and that it

was widespread in the Company across multiple business lines, rather than being limited to a few employees in the wealth management business.

128.    The *Times* also reported on an applicant who had to go through the sham interview process.  Don Banks, a Black wealth manager from Louisiana, was told by human resources employees that he would be interviewed for a manager position in 2016 and 2017, after passing an initial interview, but never heard back.  Instead, in 2018, he was hired for a more junior position, and he was laid off two years later due to pandemic cuts.

129.    On June 1, 2022, when Wells Fargo's first diversity report was released, Santos stressed that the underlying policy – requiring half of interviewees per position that pays over $100,000 to be from a diverse community – was working to help Wells Fargo increase the diversity of its more senior positions.  Santos also acknowledged the *Times*' reporting on sham interviews and promised that Wells Fargo would take such allegations seriously.

130.    In a LinkedIn post dated June 5, 2022, and in a YouTube video, Bruno further described the systematic sham interview practice.  Bruno detailed how "[f]or the past five years," Wells Fargo had either "mandated" or made a "best practice" of "add[ing] at least one diverse candidate to a pool of at least four candidates, for any job posted at the firm.  The preference is Black/African Americans and women."  However, this led to "throw[ing] in some Black and Brown people, and women into the pool, so WF can show 'activity' towards their diversity goals."  However, Bruno also criticized Wells Fargo for framing "diversity" as a "marathon," whereby diversity became an aspiration rather than an actual goal.  And in the meantime, Wells Fargo was merely checking boxes by having managers "conduct these interviews, even though you have explained that a candidate has already been sourced and selected."  Bruno then went on to describe three "fake interviews."  He described two financial consultant positions that were already filled, and did not require additional candidates to be interviewed.  However:

> In both instances, HR at Wells Fargo, backed up by senior leadership, requires that interviews be conducted.  And as a 'best practice', one candidate needs to be diverse: preferably Black or a woman.  If these interviews are not conducted, the hiring manager cannot move forward with the hiring/restructuring.  No exceptions, they must be done by the manager.  Otherwise, the manager is not doing their job and can be removed from his or her position.  Under threat of removal, a manager is compelled to comply.

131.    Moreover, Bruno described the actual harm from conducting these false interviews, by creating a record that a minority or female candidate is inferior, when they are not, just so Wells Fargo could create a record that it was trying to be diverse:

> The above examples are real, they happened, and are happening around the country. The interviews took place. ***The interview guides were falsified, to make it look like the chosen candidate did better.*** A numerical value of 1 to 5 is given to each candidate. The one that has been prechosen receives a 4 or 5. Everyone else receives a lower number, regardless if they did better or not. The candidates that receive this fabricated number, now have a permanent record at the firm, that they failed at this interview. The qualitative part of the interview guide has language that states the candidate did not do as well as the chosen candidate. ***When a Black/African American candidate, or woman candidate, is subject to these fake interviews, and the interview guides are falsified, to make them look worse on paper than the chosen candidate, this is clearly morally and ethically wrong… and I would argue legally wrong also, for their civil rights are being broken based on the color of their skin or gender. When they come back to interview for another job at WF, there is a track record of failed attempts.*** The new hiring manager knows this information and has access to view these guides or talk to the HR recruiter who will communicate how they did on these past interviews. Is that fair? Is the starting line the same for these Black and women candidates? Or are they starting behind the start/finish line the next time they interview and are "used" again, to fill an interview pool for the purpose of showing diversity and activity at the firm. ***This is the exact definition of being disenfranchised and marginalized. Not only by society, but by a firm, in this case, Wells Fargo.*** Even though clearly an exception to not interview should have be granted; WF requires the fake interviews to go forward. If an investigator were to pull all the FC hires from around the country over the last five years, how many of them would be fake. How many of them had diversity candidates in the pool that were interviewed and had a zero chance to receive the job. The investigator would need to ask the hiring manager, if he or she had a pre-determined candidate for this FC role. Ask the FA that brought the candidate to the manager if he or she had any intention of hiring anyone else but the candidate they brought to the manager. Ask the manager and the FA if they have complained to HR, or to their immediate manager, about doing these fake interviews. And lastly, ask the hiring manager if he or she had no choice but to do these interviews, if they wanted to onboard the candidate for the job. The problem is systemic at Wells Fargo. It can easily be identified and proven. Others and I have complained for years, to HR, to our immediate managers, and to sr leaderships. Nothing has been done. And it's not just the FC position . . . it's the FAIT position, the CA position, the local Branch Manager position, and yes, even the Market Leader position and Divisional Leader position.

[Ellipsis in original, emphasis added].

132.    Bruno also recounted fake interviews being conducted when Wells Fargo was consolidating two South Florida markets. The former market leaders are the most qualified for the new consolidated market lead position, one of whom is Hispanic and has been at the Company for 20 years. Despite the presence of qualified candidates, at least one of whom would fulfill Wells Fargo's diversity criteria, Wells Fargo senior management had determined to transfer someone

34

from corporate headquarters who did not have branch management experience but wanted to move to Florida with his family.  Nevertheless, Wells Fargo went through the motions of conducting interviews when it had already determined who would get the role.

133.    Bruno also recounted another example of business units consolidating and conducting fake interviews for a new role.  Again, a qualified diverse candidate was available and interviewed – female and a member of the LGBTQ community – but instead a man with a reputation for bullying was pre-slated for a job and got it.  Interviews with diverse candidates were fake because the Company had already determined to give it to the man with a reputation for bullying.

134.    On June 9, 2022, in an article entitled *Federal Prosecutors Open Criminal Inquiry of Wells Fargo's Hiring Practices*, *The New York Times* revealed that the federal government was investigating whether Wells Fargo violated federal anti-discrimination laws by conducting sham job interviews.  Wells Fargo had a policy of conducting interviews with diverse candidates to improve the diversity of its workforce, and had formalized the policy in 2020.  But the policy was twisted through the sham interviews, which made the interview process more about papering a record than actually improving diversity.

135.    The investigation was being run by a newly formed civil rights unit, potentially resulting in criminal violations of civil rights statutes.  For example, according to the *Times*, "it is a crime to interfere with 'an applicant for private employment' in a way motivated by the applicant's 'race, color, religion or national origin.'"

136.    The June 2022 *Times* report also revealed that sham interviews occurred across multiple business lines at Wells Fargo, rather than being limited to the wealth management unit, as the *Times*' earlier May 2022 report had focused on.  The June 2022 *Times* report was based on 10 more employees or applicants coming forth to report either being subject to sham interviews, conducting them, or seeing paperwork documenting the practice.  While Wells Fargo's head of Human Resources claimed to not know about the practice, the *Times* reported that it saw written records documenting the practice going back to at least 2020.  In one instance, a person who was offered a job who met the Company's diversity standards, a human resources employee asked that

1  applicant to also apply for a different job in the Company.  Wells Fargo explained that the applicant

2  still had the first offer, but the Company wanted to show it had "qualified candidates" for both

3  jobs, for "book keeping."

4       137.    Around the *Times* reports, Wells Fargo paused and reviewed its diverse candidate

5  program.  Approximately two months later, it revived the policy – acknowledging only that it "can

6  be overly prescriptive" rather than the underlying wrongdoing, which was falsely offering

7  interviews to applicants that the Company had no intention of hiring, so that the Company could

8  check some boxes with regulators, such as the DOL, that it was fulfilling its affirmative action

9  program or otherwise fulfilling regulatory requirements to prevent discrimination, when in reality

10  it was engaging in the opposite.  And rather than seek to improve diversity, the program would

11  ***reduce*** the requirement to interview diverse candidates.  However, the Company appeared to be

12  targeting the wrong problem, which was not that the Company should offer interviews to diverse

13  candidates – a practice that in itself no one thought was wrong.  Rather, the problem was that

14  applicants were being interviewed for positions that were already filled, just to check a box off

15  that a diverse candidate was interviewed.

16       138.    In total, the *Times* spoke to 22 former or current Wells Fargo employees who all

17  confirmed that the Company had engaged in sham interviews.  Moreover, the *Times* reported that

18  Wells Fargo conducted sham interviews across multiple business lines, including its management,

19  mortgage servicing, home lending, and retail banking businesses.

20       139.    On September 13, 2022, ahead of two days of Congressional hearings, Wells Fargo

21  agreed to have a third-party conduct a racial equity audit of its business, even though for years it

22  had opposed shareholders' proposals to do so.  Wells Fargo was forced to act based on the twin

23  scandals of the spring and summer of 2022 showing that it discriminated against Black and other

24  minority customers by refusing to refinance their mortgages or lend to them in the first place and

25  that it discriminated against Black and other minority job applicants by pretending to consider

26  them for jobs that it had already filled.  Wells Fargo's audit, however, will be watered down from

27  those proposed by shareholders.  While shareholders had proposed audits to study what "adverse

28

impacts" the Company had on minority communities, Wells Fargo will commission an audit on how it can "serve diverse communities and promote a diverse workforce."

140.   On September 21, 2022, Scharf testified before the House of Representatives Committee on Financial Services.   Committee Chairwoman Representative Maxine Waters criticized him for overseeing a series of scandals under his tenure, including the sham interview scandal and the discrimination against borrowers scandal.

141.   On September 22, 2022, Scharf testified before the Senate Committee on Banking, Housing and Urban Affairs.  Senator Sherrod Brown levied similar criticisms against Scharf and Wells Fargo as Chairwoman Waters had the day before.

142.   Wells Fargo's purported fixes to its program did not satisfy regulators.  In October 2022, Wells Fargo disclosed that the SEC, as well as the DOJ, "have undertaken formal or informal inquiries or investigations regarding the company's hiring practices related to diversity."

## VI.   THE BOARD PASSIVELY STOOD BY WHILE BEING PRESENTED WITH DEI PROBLEMS

### A.   The 220 Documents Further Demonstrate Defendants' Liability

143.   Internal Company books and records produced to Plaintiffs show that, despite a surface interest in, and acknowledgement of, the Company's problems with DEI, the Board and management of the Company were more interested in the reputation and perception of the Company's engagement with DEI issues than actually addressing them substantively.  The Board and management acted on DEI issues only after negative media coverage forced them to.  Internal documents show that the Board was aware that the Company continued to have major difficulties meeting its DEI targets well into CEO Scharf's supposed revamping and introduction of the Diverse Search Requirement, which is not surprising, given the structural weaknesses in the policy.

144.   The minutes of the October 26, 2020 Board meeting show that the Board requested that DEI issues be a regular Board agenda item, but the Board merely received reports rather than actively conducted oversight to ensure the DEI initiatives were actually working. WF_DS_000001376.  And DEI issues were presented to the Board at its meetings on January 27, 2020 (WF_DS_000000109); June 22, 2020 (WF_DS_000000365); October 26, 2020 (WF_DS_

000001376); November 16, 2020 (WF_DS_000000665); January 25, 2021 (WF_DS_000000725); February 22, 2021 (WF_DS_000000762); April 1, 2021 (WF_DS_000000789); April 26, 2021 (WF_DS_000001836); July 26, 2021 (WF_DS_000001911); October 25, 2021 (WF_DS_ 000001943); December 13, 2021 (WF_DS_000001965); April 25, 2022 (WF_DS_000005818); May 22, 2022 (WF_DS_000002863); June 27, 2022 (WF_DS_000003136); July 25, 2022 (WF_DS_000005036); and September 23, 2022 (WF_DS_000005152).

145.    On June 18, 2020, a presentation to the Human Resources Committee showed that turnover rates were much higher for females and ethnically diverse employees. WF_DS_000000179; WF_DS_000001298.    An October 8, 2020 presentation to the Human Resources Committee showed the same thing.  WF_DS_000001340.

146.    On January 26, 2021, a presentation to the Human Resources Committee showed that as of December 31, 2020, senior management at the Company was just 25% ethnically diverse, including just 9% Black/African American.  WF_DS_000000315.  A December 15, 2021 presentation to the Board showed that overall Hispanic representation at the Company was down year-over-year, while attrition was 15.4% for Black executives, compared to 10.6% for the Company overall.  WF_DS_000002739.  On January 24, 2022, Santos reported to the Board that the Company had continued problems with attrition of Hispanic and Black employees. WF_DS_000002004; WF_DS_000002809.  A June 28, 2022 presentation to the Human Resources Committee showed that the executive headcount was down for females and Black executives, and that rates for female, Black, and Hispanic executives were well below Company average. WF_DS_000002841.  Further, after nearly two years of Scharf's DEI initiatives, ***hiring rates*** for White executive applicants remained higher than Black executive applicants.

147.    Other metrics shown to the Board underscore that in many ways, things were getting worse, not better, for Company employees from underrepresented groups.  On August 13, 2020, a presentation to the Risk Committee showed a marked increase in substantiated allegations of harassment, discrimination, and retaliation.  WF_DS_000000590.  Management attributed the increase to work being done to tackle the backlog of such allegations.  Such allegations continued rising through the year, however.  A November 17, 2020 presentation to the Human Resources

Committee showed an increase in racial discrimination allegations since May 2020, in the wake of the George Floyd national racial reckoning.   WF_DS_000001232.   A January 25, 2022 presentation to the Human Resources Committee shows that representation of females and ethnically diverse employees was "underutilized" at the executive level.  WF_DS_000001517.

148.   The Human Resources Committee was regularly informed that insufficient diversity of the Company's workforce represented a serious human capital risk.  On November 17, 2020, a presentation to the Human Resources Committee showed that lawsuits cost the Company $24.5 million the previous 12 months, with exposure likely to increase over the next 12 months. WF_DS_000001232.  On February 23, 2021, a presentation to the Human Resources Committee showed that substantiated allegations of harassment, discrimination, and retaliation increased each quarter in 2020.  WF_DS_000001254.  The presentation also showed a loss of $28.9 million that quarter attributed to insufficient diversity in the workforce.  WF_DS_000001261.  On June 29, 2021, a presentation to the Human Resources Committee showed that lawsuits regarding discrimination and similar allegations represented 89% of the Company's internal human capital losses that quarter – and that such exposure was likely to increase over the ensuing twelve months. WF_DS_000000694.  On October 26, 2021, a presentation to the Human Resources Committee showed that lawsuits re discrimination had cost the Company $10 million that quarter – again, 88% of total internal human capital losses, with exposure again likely to increase. WF_DS_000000915.  On February 28, 2022, the Human Resources Committee received a similar report showing a continued elevated risk to the Company due to insufficient diversity in the workforce.   WF_DS000001741.   On June 28, 2022, a presentation to the Human Resources Committee showed that insufficient diversity in the workplace remained a risk to the Company – and further, that the Company had received approximately 16,000 employee-reported allegations of harassment, discrimination, and retaliation over the previous year, which was characterized as "a high number given the employee base."  WF_DS_000002859.

149.   Beyond being a known risk in the aggregate, Board members were made aware of at least one specific case involving fake interviews before *The New York Times* article came out. On December 13, 2021, a presentation to the Governance and Nominating Committee showed an

1    allegation of racial discrimination by an individual who felt they were a token candidate for a job

2    interview.  WF_DS_000004661.

3        150.    Defendants set a tone of tokenism at the top of the Company by their reactivity to

4    negative news, and by putting members of underrepresented groups exclusively in charge of

5    solving their problems, signaling a minimization of these issues to Company employees as a

6    whole.  For instance, Scharf created a new Operating Committee-level organization dedicated to

7    DEI issues in November 2020 – two months after the firestorm caused when *The New York Times*

8    reported on Scharf's June 2020 comments regarding the lack of qualified Black executive talent.

9    This new group, titled Diverse Segments, Representation & Inclusion ("DSRI"), was headed by

10   Kleber Santos.  As of January 2021, the leadership of the DSRI segment was entirely composed

11   of members of underrepresented groups.  WF_DS_000000704.  According to a November 2020

12   presentation to the Board, the two Black Board members – and not the others – were specifically

13   and repeatedly called out as meeting with Black leadership at Wells Fargo.  WF_DS_000001368.

14   Studies show that diversity initiatives spearheaded exclusively by underrepresented group

15   members place an undue burden on those individuals to push DEI initiatives.  *See* Emily Burkhardt

16   Vicente, *Enhancing Diversity & Inclusion in the Financial Sector: Practical Strategies for*

17   *Recruiting and Retaining Diverse Talent*, BANKING EXCHANGE (Nov. 22, 2020)

18   (https://m.bankingexchange.com/news-feed/item/8486-enhancing-diversity-inclusion-in-the-

19   financial-sector-practical-strategies-for-recruiting-and-retaining-diverse-talent).  In addition, the

20   Diverse Search Requirement contained a number of characteristics which actually drive down

21   overall employee buy-in, as well as effectiveness of diversity initiatives themselves.  *See* Frank

22   Dobbin and Alexandra Kalev, *Why Diversity Programs Fail*, HARVARD BUS. REV. (July 2016)

23   (https://hbr.org/2016/07/why-diversity-programs-fail).

24       151.    The Company's own internal surveys showed a significant gap between the

25   Company's perceived support of diversity in the workforce between Black employees and the

26   overall Wells Fargo workforce.  WF_DS_000001265.  At the October 25, 2021 Board meeting,

27   Santos reported his own opinions, unsupported by data, as to the support for DEI initiatives among

28   White males at the Company.  WF_DS_000001943.

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

152.   On May 22, 2022, the Board discussed the criminal subpoena sent from the Southern District of New York regarding the Company's diverse hiring slate controversy. WF_DS_000002863.  At the June 27, 2022 Board meeting, Scharf and Santos downplayed the media reports of fake interviews.  Santos claimed that data of the hiring processes showed that the allegations were not supported, and there were a small number of complaints. WF_DS_000003136.  Scharf agreed that management did not believe there were any systemic issues with the hiring process.  WF_DS_000003141.

153.   Scharf eventually acknowledged the failure of the Diverse Search Requirement.  In a July 25, 2022 presentation to the Human Resources Committee, Scharf stated that Company leaders and managers require further education and support to embrace DEI with their "hearts and minds," rather than a "check the box" attitude.  WF_DS_000002876.  He also stated that the Company had "not done a great job articulating our story in a holistic and strategic way." WF_DS_000002876.  The 220 Documents also suggest that Defendants were more concerned about the reputation of the Company than seriously addressing its DEI failures.  On February 22, 2022, a presentation to the CRC suggested that the Human Rights Impact Assessment conducted by the Company was done so as to better oppose a shareholder proposal calling for a racial equity audit.  WF_DS_000004749.

154.   Moreover, the Board similarly only provided token oversight on the borrower issues.  On December 6, 2019, the Stakeholder Advisory Council convened, and considered a disparate impact update, including the Company's fair lending policy and oversight to avoid policies or practices that have a disparate impact on protected classes.  WF_DS_000003299.

155.   On April 1, 2020, a presentation to the Board regarding the 2020 capital plan for the Company included references to mortgage-related civil litigation (WF_DS_000005447) and Memphis fair lending claims (WF_DS_000005448).

156.   On August 11, 2020, the Corporate Responsibility Committee reviewed a proposal for the Company's fair lending practices to mitigate minority lending distribution risk. WF_DS_000003600.

157.    On August 11, 2020, a presentation to the Corporate Responsibility Committee on fair lending issues showed, among other things, that redlining presented a risk to the Company. WF_DS_000005748.

158.    On August 15, 2020, the Compliance Subcommittee of the Risk Committee received an update on fair lending issues.  WF_DS_000005779.

159.    On August 11, 2020, a presentation to the Corporate Responsibility Committee on fair lending issues indicated that the Company was receiving legal assistance in its evaluation of how to address systemic discrimination against African American consumers and businesses. WF_DS_000005752.

160.    On February 22, 2021, the Board received a report on DEI matters, including a stated focus on, among other things, home lending, consumer and small business banking, and wealth and investment management from a DEI perspective.  WF_DS_000000762.

161.    On July 8, 2021, the Stakeholder Advisory Council received an update on the Company's Office of Consumer Practices, and raised the issue whether the office would address past racial lending issues.  WF_DS_000004522.

162.    On July 26, 2021, a presentation to the Risk Committee described the Company's fair lending training program.  WF_DS_000005797.

163.    On October 25, 2021, the Board received a report from the Demand Review Committee recommending that the Board reject a shareholder litigation demand letter regarding the Company's minority lending practices; the Board agreed to reject the demand. WF_DS_000001943.

164.    On April 25, 2022, the Corporate Responsibility Committee received a public affairs update on fair lending.  WF_DS_000005814.  The same day, the Board, as a whole, received an update from the Consumer Lending group regarding fair lending issues.  WF_DS_000005818.

165.    On September 23, 2022, a presentation to the Corporate Responsibility Committee indicated that positive news coverage of the Company decreased to just 24% in 2Q22, driven largely by media reports on the Company's discriminatory lending and interview practices. WF_DS_000005058.    The entire Board was apprised the same day that consumer lending

1  represented an enterprise risk to the Company due to the reaction to *Bloomberg*'s articles on

2  lending discrimination.  WF_DS_000005066.

3       166.  Despite learning about numerous fair lending issues and litigation, the Board did

4  not take action to correct Wells Fargo's longstanding problems with discrimination, which are

5  apparent on their face from Wells Fargo's low refinancing rates for minorities compared to other

6  major banks and compared to Wells Fargo's refinancing rates for Whites.  Moreover, instead of

7  attempting to correct the Company's discrimination, the Board was merely concerned with

8  whether Wells Fargo faced negative publicity, and was relieved that after months of bad news, by

9  September 2022, the bad news was still limited.

10 **VII.  DAMAGES TO THE COMPANY**

11      167.  As a result of the Individual Defendants' knowing misconduct, Wells Fargo

12 engaged in an unlawful and deceptive scheme of discriminating against minorities, especially

13 Blacks, in mortgage lending, refinancing, and hiring.  Wells Fargo's conduct violated Federal anti-

14 discrimination laws, to its own detriment and the detriment of its shareholders.  Wells Fargo's

15 misconduct is particularly egregious because it has already settled discrimination actions for

16 hundreds of millions of dollars and programmatic relief.  Pending litigation will likely lead to other

17 substantive settlements.  Furthermore, along with its other compliance failures, discrimination

18 prevents Wells Fargo from growing its business because it prevents the Federal Reserve from

19 lifting the Company's asset cap.

20      168.  Finally, Wells Fargo's business, goodwill, and reputation have been, and will

21 continue to be, severely damaged by the Individual Defendants' decision to allow and/or failure to

22 prevent the Company's discrimination against minorities.

23 **VIII.  INSIDER TRADING ALLEGATIONS**

24      169.  On May 3, 2022, shortly before the *Times*' initial report that revealed the sham

25 interview scandal, Santos sold $1,008,788 of stock, while in possession of material non-public

26 information.  These sales placed Santos' shares onto the open market at fraud-inflated prices at a

27 time when the Company was engaging in racial discrimination while telling the market that it

28 valued diversity.

170.    Santos, who was in charge of DEI programs at Wells Fargo, knew of the racial discrimination at the Company.  Consequently, Santos was in possession of material non-public information and was prohibited from trading Company stock until such information was revealed to the public.

171.    Specifically, Santos knew that the Diverse Search Requirement that Wells Fargo repeatedly touted to the public was a sham, because employees conducted sham interviews where they would check the box that they interviewed diverse candidates even when the jobs had already been filled.

172.    Santos' sales were inconsistent with past trading patterns and suspicious in their timing and amount.

## IX.    DERIVATIVE ALLEGATIONS

173.    Plaintiffs bring this action derivatively in the right of, and for the benefit of, Wells Fargo to redress the breaches of fiduciary duty and other violations of law committed by the Individual Defendants, as alleged herein.

174.    Plaintiffs will adequately and fairly represent the interests of Wells Fargo and its shareholders in enforcing and prosecuting the Company's rights, and Plaintiffs have retained counsel experienced in prosecuting this type of derivative action.  Plaintiffs have continuously held Wells Fargo stock throughout the Relevant Period and will continue to hold Wells Fargo stock through the resolution of this action.

175.    Plaintiffs have not made a pre-suit demand on the Board to assert the claims set forth herein against the Individual Defendants because such a demand would have been futile, and is thereby excused, since the allegations herein, at minimum, permit the inference that the directors lack the requisite disinterest to determine fairly whether these claims should be pursued.

176.    In preparing to file this action, Plaintiffs conducted an investigation by inspecting internal books and records under 8 *Del C.* §220.  As a result, Plaintiffs have adequately informed themselves as to the merits and as to whether making a demand on the Board would be futile.

177.    Plaintiff Isais made his 220 demand on August 5, 2022.  The Company and Isais executed a confidentiality agreement on September 27, 2022.  In response to Plaintiff Isais'

demand, Wells Fargo made four productions of documents.  These productions totaled 403 documents of 5,841 pages on October 28, 2022, November 4, 2022, December 2, 2022, and December 30, 2022.

178.    Plaintiff Asbestos Workers made its demand on March 7, 2022.  The Company and Asbestos Workers executed a confidentiality agreement on March 10, 2022.  With the execution of the confidentiality agreement, Wells Fargo agreed that the documents produced to Isais are deemed re-produced to Asbestos Workers.

179.    Because Plaintiffs have the broadest 220 production in response to an early-made demand, Plaintiffs are in the best position to evaluate the merits and demand futility based on internal and confidential corporate books and records.  As explained below, demand is futile because a majority of the Board faces a substantial likelihood of liability due to their failure to provide oversight to prevent and remedy pervasive racial discrimination against minority (especially Black) borrowers, job applicants, and employees.

## X.    DEMAND FUTILITY ALLEGATIONS

180.    A demand on the Board to bring the claims asserted herein would be a futile and useless act because there is a reasonable doubt that a majority of the current 14-member Board is capable of making an independent and disinterested decision about whether to institute and vigorously prosecute this action.

181.    All 14 members of the Board of Directors have received reports concerning Wells Fargo's racial discrimination in the interview process and against borrowers.  However, the 14 directors ignored these red flags and did not conduct any more extensive oversight, or otherwise remedy or try to prevent this discrimination.  As a result, the 14 directors are condoning illegal conduct by Wells Fargo, and that "ostrich-like" condonation constitutes a bad-faith breach of their fiduciary duties to the Company.  By breaching their fiduciary duties, these 14 directors face a substantial likelihood of liability.  That substantial likelihood of liability, as a result, makes these 14 directors interested and not independent in whether they can assess a demand for litigation against them or the Officer Defendants, who are alleged to have engaged in the same misconduct. As a result, making a demand on these 14 directors is futile.

## XI.    CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### <u>Against All Individual Defendants</u>

182.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully set forth herein.

183.    The Individual Defendants each owe (and owed) Wells Fargo and its shareholders fiduciary duties of loyalty, good faith, candor, trust, and due care in managing the Company's affairs.

184.    As detailed above, the Individual Defendants breached their fiduciary duties by permitting Wells Fargo, its directors, and officers to violate Federal anti-discrimination laws, through discriminating against Black and other minority borrowers, through unfavorable mortgage approval and refinancing processes and rates, as well as Black and other minority employees and job applicants, through conducting sham interviews to nominally fulfill a diversity-enhancing policy for purposes of misleading regulators into thinking Wells Fargo was complying with anti-discrimination and affirmative action obligations, as well as violating federal securities laws by misrepresenting to investors Wells Fargo's commitment to diversity, as well as the Company's own internal policies.

185.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, Wells Fargo has been damaged, not only monetarily, but also with regard to its corporate image and goodwill, as well as the damages caused by continued violations of law, which contribute to how the Federal Reserve will maintain an asset cap on Wells Fargo that prevents the Company from growing.

186.    As a result, Plaintiffs bring this claim on behalf of Wells Fargo to remedy Individual Defendants' violations of law.

187.    Plaintiffs, on behalf of Wells Fargo, have no adequate remedy at law.

1

**COUNT II**
**Corporate Waste**
**Against the Individual Defendants**

2

3    188.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

4    above as if fully set forth herein.

5    189.    By rewarding themselves through the payment of outsized incentive compensation

6    while causing Wells Fargo to violate the law, and by facilitating the insider sales by Santos, the

7    Individual Defendants have caused Wells Fargo to waste valuable corporate assets.

8    190.    As a direct and proximate result of the Individual Defendants' breaches of their

9    fiduciary duties, Wells Fargo has been damaged, not only monetarily, but also with regard to its

10    corporate image and goodwill, as well as the damages caused by continued violations of law, which

11    contribute to how the Federal Reserve will maintain an asset cap on Wells Fargo that prevents the

12    Company from growing.

13    191.    As a result, Plaintiffs bring this claim on behalf of Wells Fargo to remedy Individual

14    Defendants' violations of law.

15    192.    Plaintiffs, on behalf of Wells Fargo, have no adequate remedy at law.

16

**COUNT III**
**Unjust Enrichment**
**Against the Individual Defendants**

17

18    193.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

19    above as if fully set forth herein.

20    194.    As a result of the misconduct described herein, the Individual Defendants will be

21    and have been unjustly enriched at the expense of the Company and its shareholders.

22    195.    The Individual Defendants granted, authorized, approved, and/or received tens of

23    millions of dollars in outsized executive compensation while condoning the misconduct alleged

24    herein.  Further, Santos sold stock for a profit during the Relevant Period, misusing confidential

25    non-public corporate information.  The Individual Defendants should be required to disgorge the

26    ill-gotten gains they have obtained, and/or will otherwise unjustly obtain, at the expense of Wells

27    Fargo and its shareholders.  A constructive trust for the benefit of the Company should be imposed

28    thereon.

196.    All incentive compensation payments and stock sale proceeds granted, authorized, approved, and/or received by the Individual Defendants were at the expense of Wells Fargo.  The Company was inadequately compensated for these payments and stock sale proceeds.

197.    As a direct and proximate result of the Individual Defendants' unjust enrichment, Wells Fargo has been damaged, not only monetarily, but also with regard to its corporate image and goodwill, as well as the damages caused by continued violations of law, which contribute to how the Federal Reserve will maintain an asset cap on Wells Fargo that prevents the Company from growing.

198.    As a result, Plaintiffs bring this claim on behalf of Wells Fargo to remedy Individual Defendants' violations of law.

199.    Plaintiffs, on behalf of Wells Fargo, have no adequate remedy at law.

**COUNT IV**
**Breach of Fiduciary Duty for Insider Trading**
**and Misappropriation of Information Against Santos**

200.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully set forth herein.

201.    At the time of the stock sales set forth herein, Santos knew the material non-public information described above and sold Wells Fargo common stock on the basis of such information.

202.    The information described above was proprietary non-public information concerning the Company's operation, financial condition, and future business prospects.  It was a proprietary asset belonging to the Company, which Santos used for his own benefit when he sold Wells Fargo common stock.

203.    At the time of his stock sales, Santos knew of and/or was engaging in a scheme to cause the Company to violate anti-discrimination laws through discriminating against Black and other minority borrowers, job applicants, and employees, as well as violate the securities laws by misleading investors into the extent of Wells Fargo's diversity commitments.  Santos' sale of Wells Fargo common stock while in possession and control of this material adverse non-public information was a breach of the fiduciary duties of loyalty and good faith, and the concealment of

1    this material non-public information allowed Santos to knowingly sell his shares at artificially

2    inflated prices.

3         204.    As a direct and proximate result of Santos' insider selling and breach of fiduciary

4    duties, Wells Fargo has suffered damages, not only monetarily, but also to its corporate image and

5    goodwill.  Because the Individual Defendants used the Company's proprietary information for

6    their own gain, the Company is entitled to the imposition of a constructive trust on any profits

7    Santos obtained thereby.

8                                **COUNT V**
                       **Violation of §14(a) of the Exchange Act**
9                     <u>**Against All of the Director Defendants**</u>

10        205.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

11   above as if fully set forth herein.

12        206.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the

13   Exchange Act, provides:

14        No solicitation subject to this regulation shall be made by means of any proxy
          statement, form of proxy, notice of meeting or other communication, written or
15        oral, containing any statement which, at the time and in the light of the
          circumstances under which it is made, is false or misleading with respect to any
16        material fact, or which omits to state any material fact necessary in order to make
          the statements therein not false or misleading or necessary to correct any statement
17        in any earlier communication with respect to the solicitation of a proxy for the same
          meeting or subject matter which has become false or misleading.
18

19   17 C.F.R. §240.14a-9(a).

20        207.    The Director Defendants exercised control over Wells Fargo and caused Wells

21   Fargo to disseminate the false and misleading Proxy Statements in 2021 and 2022.  These Proxy

22   Statements materially misrepresented Wells Fargo's diversity commitment by highlighting Wells

23   Fargo's Diverse Search Requirement without revealing that it was a sham because Wells Fargo

24   employees conducted interviews for diverse candidates when positions were already filled; thus,

25   while nominally Wells Fargo made it appear it was benefiting diverse candidates, it was actually

26   harming them by giving them false prospects of jobs and manipulating their interview scores to be

27   lower so that they could justify denying them the job, and those lower scores, in turn, could hurt

28   the applicant's future job prospects at other Wells Fargo opportunities when future interviewers

                                    49

did not know that the previous interview was a sham.  Wells Fargo used its false representations of the Diverse Search Requirement to head off shareholder proposals to increase diverse recruiting, conduct equity audits by third parties, or issue DEI reports.  The Board also falsely touted the Diverse Search Requirement, as well as noting the fact that diversity would factor into executive compensation, to then induce shareholders into voting for the Company's long-term incentive program in 2022 that would benefit the Company's officers and directors.  The Board furthermore induced a public vote of confidence in the advisory say-on-pay annual vote regarding executive compensation by giving shareholders a false understanding that the Company was committed to DEI and compliance with federal anti-discrimination laws and affirmative action requirements in both 2021 and 2022.  Finally, the Board induced shareholders to vote for directors' re-election through giving the shareholders a false impression that directors conducted good faith oversight to ensure compliance with federal anti-discrimination laws and affirmative action requirements.

208.    As stated herein, these Proxy Statements contained untrue statements of material facts and omitted material facts necessary to make the statements that were made not false and misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  These false statements and omissions were essential links in the re-election of each of the directors, formed the basis of the Company's shareholders' "say-on-pay" vote, as well as the shareholders' approval of the Company's long-term incentive plan, and the continued mismanagement of Wells Fargo.

209.    The written communications made by the Individual Defendants described herein constitute violations of Rule 14a-9 and §14(a) because such communications were materially false and/or misleading and were provided in a negligent manner.

210.    At all relevant times to the dissemination of the materially false and/or misleading Proxy Statements, the Individual Defendants were aware of, and/or had access to, the facts concerning Wells Fargo's discrimination against borrowers and employees or job applicants.

211.    Wells Fargo, as a result, has been injured by this conduct and is entitled to damages and equitable relief.

**COUNT VI**
**Violation of §29(b) of the Exchange Act**
**Against All of the Director Defendants**

212.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully set forth herein.

213.    The Director Defendants each received incentive compensation and fees, including stock awards, while engaging in conduct that violates §14(a) of the Exchange Act.  The Director Defendants' incentive compensation and fees should be rescinded under §29 of the Exchange Act because these Defendants violated §14(a) by issuing false and misleading reports to Wells Fargo shareholders regarding the nature of, and responsibility for, violations of federal law and regulations.  All of the payments the Director Defendants received are therefore voidable by Wells Fargo under §29(b) of the Exchange Act.

214.    Wells Fargo is in privity with the Director Defendants with respect to the incentive compensation and fees provided by Wells Fargo to these Defendants.  The Director Defendants have engaged in prohibited conduct in violation of the securities laws as alleged herein.

215.    Wells Fargo has been severely injured by the misconduct of the Director Defendants.  Accordingly, Wells Fargo is entitled to damages, *i.e.*, rescission of the incentives, compensation, and fees granted to the Director Defendants.

**XII.    PRAYER FOR RELIEF**

216.    WHEREFORE, Plaintiffs demand judgment as follows:

A.    Declaring that Plaintiffs may maintain this derivative action on behalf of Wells Fargo and that Plaintiffs are proper and adequate representatives of the Company;

B.    Declaring that the Individual Defendants have breached their fiduciary duties of care and loyalty to Wells Fargo;

C.    Determining and awarding to Wells Fargo the damages sustained by it, as a result of the breaches of fiduciary duty and other claims set forth above from each of the Individual Defendants, jointly and severally;

D.    Awarding to Wells Fargo restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by them.  Including all

1  profits, special benefits, and unjust enrichment they have obtained as a result of their unlawful

2  conduct, payment of incentive compensation (whether in the form of cash bonuses, stock awards,

3  or stock option grants), and common stock sale proceeds;

4      E.      Directing Wells Fargo to take all necessary actions to reform and improve its

5  corporate governance and internal procedures, to enable the Company to comply with the

6  Company's existing governance obligations and all applicable laws, and to protect the Company

7  and its stockholders from a recurrence of the damaging events described herein, including, but not

8  limited to, the following specific relief:

9          (i)      Improving measures in the Company to prevent and remedy illegal

10         discrimination against customers and employees;

11         (ii)      requiring the Company to implement additional audit, compliance, and

12         internal control procedures;

13         (iii)      requiring independent approval of the terms and timing of insider stock

14         selling and stock option grants;

15     F.      Awarding to Plaintiffs the costs and disbursements of the action, including

16  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

17     G.      Awarding costs and disbursements of this action, including reasonable attorneys',

18  accountants, and experts' fees;

19     H.      Awarding pre- and post-judgment interest; and

20     I.      Granting such other and further relief as the Court deems just and equitable.

21  **XIII.  JURY DEMAND**

22     217.    Plaintiffs demand trial by jury.

23  Dated: March 15, 2023                    Respectfully submitted,

24                                           **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

25                                            s/ *Joseph A. Pettigrew*
                                            _____
26                                           Joseph A. Pettigrew (CA 236933)
                                           *Of Counsel*

27

28

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
jpettigrew@scott-scott.com

Geoffrey M. Johnson
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: 216-229-6088
gjohnson@scott-scott.com

Jing-Li Yu (CA 342985)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
jyu@scott-scott.com

*Counsel for Plaintiffs Asbestos Workers Philadelphia Welfare and Pension Fund and Jose F. Isais*

**KEHOE LAW FIRM, P.C.**
John A. Kehoe
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19102
Telephone: (215) 792-6676
jkehoe@kehoelawfirm.com

*Additional Counsel for Plaintiff Asbestos Workers Philadelphia Welfare and Pension Fund*

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

## **VERIFICATION**

*Asbestos Workers Philadelphia Welfare and Pension Fund v. Charles W. Scharf*

I, STEPHEN F. PETTIT, do hereby declare:

    1.      I am the Business Manager, Financial & Corresponding Secretary, and a duly recognized agent and representative for the Asbestos Workers Philadelphia Welfare and Pension Fund (the "Fund"), located in Philadelphia County, Pennsylvania.

    2.      The Fund is a derivative plaintiff in the above-titled action.  I verify that I have reviewed the Verified Stockholder Derivative Action Complaint (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern the Fund, are true to my personal knowledge.  I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

    3.      The Fund has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to the Fund; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

    I declare under penalty of perjury that the foregoing is true and correct.

Executed on the ___ day of March, 2023.  3/15/2023


44B5DE7DDD1B4D9...

Stephen F. Pettit
Business Manager,
Financial & Corresponding Secretary,
Representative for Asbestos Workers
Philadelphia Welfare and Pension Fund

## **VERIFICATION**

*Asbestos Workers Philadelphia Welfare and Pension Fund v. Charles W. Scharf*

I, JOSE ISAIS, do hereby declare:

1.      I am a derivative plaintiff in the above-titled action, and located in Los Angeles County, California.  I verify that I have reviewed the Verified Stockholder Derivative Action Complaint (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern myself, are true to my personal knowledge.  I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

2.      I have not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to me; or (ii) reimbursement, by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the *15* day of March, 2023.

_____
Jose Isais